551 A.2d 253

In re ADOPTION OF Kathryn STUNKARD.

Appeal of GOLDEN CRADLE.

Superior Court of Pennsylvania.

Argued Oct. 13, 1988.
Filed Dec. 5, 1988.

Samuel C. Totaro, Jr., Feasterville, for appellant.

Before ROWLEY, WIEAND and BECK, JJ.

BECK, Judge:

Appellant, Golden Cradle, appeals the adjudication of the orphans' court of Montgomery County denying its petition for the involuntary termination of the parental rights of Timothy Donnelly.  As we agree with the orphans' court that appellant failed to show, by clear and convincing evidence, that parental rights should be terminated, the order appealed from is affirmed.

This case involves a petition by Golden Cradle, a licensed adoption agency and intermediary in this case, to terminate the parental rights of an unwed father.  The child involved, Kathryn Stunkard, has, for the past two years, resided with her pre-adoptive parents.

The facts relevant to the case are as follows.  Timothy Donnelly (appellee) and Rebecca Stunkard met while both were nineteen and working at Pomeroy's department store in their home town of Wilmington, Delaware.  Rebecca was a full-time employee, and Timothy was a college student working part-time.  They began dating in November of 1985.  Rebecca became pregnant in February of the following year.  As was noted by the orphans' court, Rebecca and Timothy talked at length about what they were going to do concerning the pregnancy, never coming to any conclusion.  Although they initially considered abortion, this idea was dismissed and Rebecca decided to carry the baby to term.  The couple apparently discussed the possibilities of marriage, living together, and putting the baby up for adoption, yet no concrete plans ever materialized.  Rebecca testified that, becoming increasingly weary of Timothy's indecision, she terminated the relationship in August of 1986.  Shortly thereafter, Rebecca contacted Timothy to inform him of her plans to place the baby for adoption.  In October, Timothy received adoption forms from Golden Cradle which he informed Rebecca that he would not sign.  However, he told Rebecca on several occasions that he would not attempt to stand in the way of her placing the baby for adoption.  In

early November, Timothy contacted Rebecca to inquire as to expected arrival time of the child.

Kathryn Stunkard was born on November 15, 1986, and Rebecca's mother informed Timothy's mother of the birth. Timothy and his parents viewed Kathryn from behind a glass partition for 45 minutes on November 17. Rebecca informed Timothy that if he wished to take the child, he should make arrangements to do so on November 18. She further informed him that if he did not wish to take the child, the child would be placed with Golden Cradle for delivery to the prospective adoptive parents.

Timothy took no action and on November 18, Rebecca signed a consent to adoption and the child was delivered, by Golden Cradle as intermediary, to her pre-adoptive parents. On or about November 20, Timothy received a letter from Golden Cradle along with a consent to adoption form. Timothy neither signed the consent nor contacted anyone in regard to it. In December of 1986, Timothy received a letter from Golden Cradle's counsel notifying him of a voluntary relinquishment hearing to be held on January 8, 1987, wherein Rebecca intended to relinquish her rights to Kathryn. The orphans' court found that Timothy did nothing although he believed that the hearing would result in the termination of his rights to Kathryn. Shortly before the hearing, Timothy visited Rebecca and told her that he would not be present at the hearing.

Rebecca voluntarily relinquished her rights to Kathryn on January 8, 1987. One week later, Timothy contacted an attorney and a meeting was arranged at Golden Cradle's offices in Bala Cynwyd. Nothing concrete came of this meeting, and on March 3, 1987, Timothy filed a petition for custody of Kathryn.

On April 15, Golden Cradle filed the instant petition for termination of Timothy's parental rights. Subsequently, there were petitions filed for discovery, motions for judgment on the pleadings, a motion for bifurcation, a petition to vacate the final decree terminating the parental rights of Rebecca Stunkard, and a request that Timothy and Rebecca

submit to psychological evaluations. Hearings were held on September 28 and 29, and on October 28, 1987. The Court of Common Pleas of Montgomery County, Orphans' Court division, denied Golden Cradle's petition for the involuntary termination of Timothy Donnelly's parental rights. This appeal by Golden Cradle followed.

Golden Cradle asserts that the orphans' court erred in holding that appellant failed to show, by clear and convincing evidence, that Timothy Donnelly's parental rights should be terminated under either relevant section of the Adoption Act. 23 Pa.C.S.A. sections 2511(a)(1), (a)(2) (Purdon Supp.1988). In addition, appellant contends that the court erred in not granting its petition for the appointment of its own medical expert to evaluate Timothy Donnelly.

Those sections of the Adoption Act dealing with the involuntary termination of parental rights provide as follows:

(a) General Rule.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent. 23 Pa.C. S.A. sections 2511(a)(1), (a)(2) (Purdon Supp.1988).

■ Given the nature of the right at stake, the U.S. Supreme Court has held that in order to successfully terminate parental rights, the burden is upon the petitioner to establish the statutory criteria by clear and convincing evidence. *Santosky v. Kramer, et al,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). Pennsylvania courts have required that the evidence be "so clear, direct,

weighty, and convincing as to enable the [factfinder] to come to a clear conviction without hesitancy, of the truth of the precise facts in issue." *In Re J.G.J., Jr.*, 367 Pa.Super. 425, 429, 532 A.2d 1218, 1220 (1987). Our scope of review in termination of parental rights cases is limited to a determination of whether the decision is supported by competent evidence. *Id.* If our comprehensive review of the record does not reveal an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's findings, the order must stand. *Id.*

■■■ Appellant first asserts that Timothy Donnelly has shown a settled purpose of relinquishing parental claim and/or refused to perform parental duties for a period in excess of six months so as to satisfy the requirements for termination under 2511(a)(1). As this section of the adoption act is written in the disjunctive, it provides for termination where a parent has, for more than six months, either (a) evidenced a settled purpose of relinquishing parental claim to the child, *or* (b) refused or failed to perform parental duties. In support of its claim, appellant suggests that the six-month period necessary to terminate parental rights may be extended to include the period of the mother's pregnancy.

We agree with the orphans' court that this argument is unpersuasive. As the court noted, there is no authority for holding that the clock is running against the father prior to the actual birth of the child. Considering that Kathryn was delivered to Golden Cradle on November 18, and that Timothy Donnelly brought his custody petition less than three months later, it is impossible to arrive at the conclusion that he evidenced a settled purpose of giving up custody for the requisite six-month period.

■■■ Similarly, given this time sequence, it cannot be concluded that Donnelly refused to perform parental duties for a period in excess of six months. Citing *In Re Adoption of Y.S.*, 487 Pa. 99, 408 A.2d 1373 (1979), Golden Cradle argues that Donnelly's failure to inquire about his daughter or to send her cards and gifts since her placement with the

pre-adoptive parents constitutes a failure to perform parental duties for a period in excess of six months. In *Y.S.*, natural parents sought reversal of an order terminating their parental rights. The parents had given custody of the child to her paternal grandparents who, in turn, sent her to live with another couple. For a year, the natural parents had no contact with the child, neither gifts nor letters were sent, and no inquiries were made into the child's well-being. The natural parents testified that they made no inquiries regarding the couple with whom their child was living, and they evidenced a general lack of concern for their child's welfare. The court, in affirming the termination order, noted that the parents had done nothing beyond litigation in regard to the child, and that they had completely failed to parent the child.

Golden Cradle asserts that *Y.S.* is analogous to the instant case as Donnelly's only action in regard to the child has been the litigation of his claim. *Y.S.*, however, is distinguishable in several respects from the instant case. For example, in *Y.S.*, the natural parents signed a voluntary consent to adoption of their child which they later revoked. The parents in *Y.S.* knew where their child was living, yet failed to keep in contact with her. The parents in *Y.S.*, had no contact with the child for a year.

In the instant case, Donnelly took no overt action which would indicate his desire to voluntarily give up his parental rights. As the identity of the pre-adoptive parents is kept in confidence, Donnelly does not now know where his daughter is living. In addition, Donnelly filed his petition for custody only three months after the birth of his daughter. Furthermore, the trial court found that subsequent to the February meeting between Donnelly and Golden Cradle, appellant was aware of Donnelly's desire to claim his daughter and fought to prevent him from having any contact with her. *See In Re J.G.J., Jr., supra*, (nonperformance of parental duties must be evaluated in light of obstacles confronting the parent.) Given these factors, we agree with the orphans' court's conclusion that Golden

Cradle failed to meet its heavy burden of proof of showing, by clear and convincing evidence, that Donnelly either (a) evidenced a settled intent to relinquish his parental claim, or (b) refused to perform his parental duties, for a period in excess of six months as required under section 2511(a)(1).

■ Golden Cradle next contends that it produced sufficient evidence to show that Donnelly's parental rights should be terminated under section 2511(a)(2) of the Adoption Act. This section requires a showing of repeated and continued incapacity, abuse, or neglect by the parent which has caused the child to be without essential parental care, control or subsistence necessary for his well-being, and which cannot or will not be remedied by the parent. In support of its contention, Golden Cradle relies almost exclusively upon the testimony of the court-appointed psychologist, Dr. Sidney Portnoy.

Dr. Portnoy examined both Timothy and Rebecca. During his session with Timothy, Portnoy had him complete the Minnesota Multiphasic Personality Inventory (MMPI). Dr. Portnoy then sent the completed test to a computer center for evaluation.

Dr. Portnoy testified that during their interview, Donnelly presented himself appropriately, was agreeable and cooperative, showed no indication of intellectual incapacity, displayed no overt psychotic conditions, appeared sensitive and easily able to express his feelings, had no conflict concerning his sexuality, and indicated an above average perceptual motor level.

However, Dr. Portnoy also testified that the results of the MMPI indicated, inter alia, that Donnelly is overly sensitive to criticism, overreacts to minor problems with anger or hostility, is highly suspicious of other people and constantly on guard to prevent being taken advantage of, is frequently aloof and rigidly moralistic, and does not assume responsibility for his problems. The results also indicated that Donnelly may have a paranoid personality disorder.

Based upon this data and his independent observations, Dr. Portnoy testified that, in his opinion, Donnelly would not be capable of assuming responsibility for the parenting of his child. In this regard, Dr. Portnoy also noted his belief that Donnelly felt that the child was a means by which to keep in contact with Rebecca, upon whom he is still emotionally dependent. Concerning appellant's contention, we must again agree with the conclusion reached by the orphans' court that appellant has failed to sustain the heavy burden of proof of showing, by clear and convincing evidence, that Timothy Donnelly's parental rights should be terminated. We note that the fact finder is not bound to accept a witness' testimony even where it stands uncontroverted. *Carl v. Kurtz,* 255 Pa.Super. 198, 386 A.2d 577 (1978). Even accepting Dr. Portnoy's testimony, it is insufficient, standing alone, to prove by clear and convincing evidence that Timothy is not capable of providing his daughter with appropriate parental care. This is especially true considering the fact that Timothy has not had the opportunity to demonstrate his parental ability.

Appellant notes, citing *In Re Adoption of Michael J.C.,* 506 Pa. 517, 486 A.2d 371 (1984), that a parent need not have had the opportunity to demonstrate his parenting abilities prior to termination of parental rights under section 2511(a)(2). In *Adoption of Michael J.C.,* the Pennsylvania Supreme Court affirmed an order of the orphans' court terminating the parental rights of a mother who, after giving her child up for adoption at birth, sought the return of her child. The Court noted that two psychiatric experts had testified that the child would be endangered if placed with his mother based upon her severe emotional problems and unstable lifestyle. The mother argued that the Court could not terminate her rights under section 2511(a)(2) on the sheer speculation that her conduct might harm the child in the future. The Supreme Court disagreed, stating:

Neither the language of the [Adoption] Act, nor our case law, supports appellee's position that Section 2511(a)(2)

requires a showing that a putative parent have an opportunity to inflict substantial physical or mental harm upon a child before the state can intervene. Rather, a more appropriate reading of the statute is that when a parent has demonstrated a continued inability to conduct his or her life in a fashion that would provide a safe environment for a child, whether that child is living with the parent or not, and the behavior of the parent is irremediable as supported by clear and competent evidence, the termination of parental rights is justified.

506 Pa. at 525, 486 A.2d at 375. In *Michael J.C.*, the evidence was overwhelming that the mother was unlikely to provide a suitable home for the child. The appellee mother had a history of mental problems, arrests, and drug and alcohol abuse. She had a history of frequent, indiscriminate sexual encounters, and violent behavior, including physical abuse of her mother and an attack on a close friend which resulted in criminal charges against her. There was, in addition, little to suggest that the mother's lifestyle would change in the future. She had had difficulty in school, and was, at one point, living in a filthy apartment covered with dog feces and obscene language. These factors were sufficient to establish, clearly and convincingly, that to give the mother custody of the child would, without doubt, have placed the child in a position of peril.

For appellant in the instant case to suggest that the instant facts are similar to those in *Michael J.C.* is completely without support. Here, there is no clear and convincing evidence to support the conclusion that Timothy Donnelly "has demonstrated a continued inability to conduct his life in a fashion that would provide a safe environment for a child." 506 Pa. at 525, 486 A.2d at 375. The most that the evidence in the instant case has shown is that Timothy Donnelly is indecisive, a trait which hardly rises to the level of those traits exhibited, over a long period of time, by the mother in *Michael, J.C.* Similarly, the testimony of Dr. Portnoy cannot be compared with the testimony

of the experts in *Michael J.C.* who clearly stated that the child's welfare would be endangered if he were placed with his mother who was diagnosed as a depressive neurotic, and who had a history of violence and drug and alcohol abuse. The lifestyle of the mother in *Michael J.C.* stands in sharp contrast to that of Timothy Donnelly, a college student who lives with his father, a college professor, and mother, a secretary for the U.S. Army.

■ Finally, appellant contends that the orphans' court erred in appointing Dr. Portnoy, a psychologist, rather than a psychiatrist. Golden Cradle argues that the court should have appointed a psychiatrist who would have the necessary background and training to diagnose a medical condition, and is the only professional allowed to use the DSM–III. Appellant further asserts that by not permitting Golden Cradle to select its own expert, it was denied the opportunity to present all the facts it wanted to prove its case. Specifically, appellant believes that where Dr. Portnoy indicated that he could not label Donnelly as having a paranoid personality disorder, a psychiatrist would have been able to make the diagnosis based upon his medical knowledge.

We find this argument to be without merit. First we note that at the outset of this case, appellant requested appointment of "a psychiatrist or other qualified professional." Appellant lodged no objection to the appointment of Dr. Portnoy, and called him as its first witness. In addition, appellant is incorrect in its assumption that, in this case, a psychiatrist would have been capable of making a diagnosis where Dr. Portnoy was not. A review of the relevant testimony reveals that Dr. Portnoy neglected to make a firm diagnosis not because he was untrained to do so, but because there was insufficient evidence to support such diagnosis. As Dr. Portnoy stated: "the data wasn't strong enough to indicate a firm conclusion, a diagnostic category." Finally, there is no precedent mandating diagnosis by a psychiatrist, as opposed to a psychologist. *See*

*Simmons v. Mullen,* 231 Pa.Super. 199, 208, 331 A.2d 892, 897–98, n. 2 (1974) (clinical psychologists have been acknowledged as experts qualified to testify on diagnosis, prognosis, and causation of emotional disturbance.)

We are persuaded under the legislative mandate and the relevant case law that our legal conclusion is correct. We are unpersuaded, however, that our decision is one which fosters the healthy development of Kathryn, an innocent victim in this compelling case.

The indecision of the father who sat back and took no affirmative action all during the pregnancy and for three months afterward to claim the child is unjustifiable. It set into motion a scenario whereby Kathryn will now be removed from the only parents she has known and placed with her natural father who is a stranger to her. The shift to the father at this point in the child's life may psychologically scar her for life. The father had an opportunity to decide the course he wished to pursue during the entire period of Rebecca's pregnancy and thereafter. His indecision is inexcusable because of its potentially disastrous impact on his child's life.

The actions of Golden Cradle also deserve comment. Once they knew the natural father did not intend to permit his rights to be terminated, they, nevertheless, continued the adoption process hoping to wear him down or win a dubious battle in court. Their action placed the child and the pre-adoptive parents at risk. The tragedy of this case is that the innocent parties—the child and the pre-adoptive parents—are the true victims.

As we find that Golden Cradle failed to prove, by clear and convincing evidence, the requisite criteria for the involuntary termination of parental rights under the Adoption Act 23 Pa.C.S.A. sections 2511(a)(1), and (a)(2), the order of the orphans' court is affirmed.

ROWLEY, J., concurs in the result.