614 A.2d 1161

**In re the ADOPTION OF B.G.S.**

**Appeal of B. Gordon NELSON, III and Kennedy B. Nelson, His Wife.**

Superior Court of Pennsylvania.

Argued Jan. 28, 1992.

Filed Aug. 17, 1992.

Reargument Denied Oct. 29, 1992.

590

Harry W. Turner, Pittsburgh, for appellants.

Robert J. Fall, Pittsburgh, for B.G.S., participating party, (at 1119).

Before TAMILIA, HUDOCK and BROSKY, JJ.

BROSKY, Judge.

B. Gordon Nelson, III and Kennedy B. Nelson ("the Nelsons"), husband and wife, have filed consolidated appeals, at No. 00885 Pittsburgh 1991 and No. 01119 Pittsburgh 1991, from the August 15, 1991 and September 27, 1991 orders of the trial court. The aforementioned orders denied the Nelsons' petition to terminate the parental rights of appellee and granted appellee's petition to proceed in forma pauperis.

In the appeal docketed at No. 00885 Pittsburgh 1991, the Nelsons' issues are as follows:

I. Is not a new trial required in a termination of parental rights case where the trial court rendered its decision without conducting a full and comprehensive hearing?

II. Is not a new trial required where a birth mother's mental capacity to parent was at issue, but the lower court refused to admit into evidence and consider the records of her recent psychiatric hospitalization and emotional counseling?

III. Is not a new trial required where the trial judge rejected all expert psychologic [sic] testimony and instead substituted his own courtroom diagnosis as the basis of his decision?

IV. Is not a new trial required where the trial court refused to admit or consider evidence of the child's unique circumstances and needs as related to parental capacity?

Appellants' Brief at 3. We affirm the order of the trial court.

In the appeal docketed at No. 01119 Pittsburgh 1991 the Nelsons' issues are as follows.

1. Whether it is an abuse of discretion for a court to summarily grant in forma pauperis status without conducting an evidentiary hearing when the truth of the allegation in support thereof are called into question?

2. Whether it is an error for a court to grant in forma pauperis status without making the requisite finding that the movant is unable to pay all or some of the costs of the proceeding without impairing his ability to obtain the necessities of life?

Appellants' Brief at 3. We affirm the order of the trial court.

APPEAL AT NO. 885 PITTSBURGH 1991.

On December 14, 1989 nineteen year-old appellee gave birth to BGS. Appellee was unmarried and living with her parents. The seventeen year-old birth father, who was a student, did not intend to assume any responsibility for the financial and emotional care of BGS. Prior to the birth of BGS appellee was urged, by her parents and the birth father, to permit BGS

to be adopted. Appellee's father told her that she would not be permitted to raise BGS in appellee's father's home. N.T., 11/26, 28/90, 12/4, 13, 19/90, at 83, 84. In October, 1989 appellee's father arranged a meeting between appellee and an attorney, who is not counsel in this case. Appellee was of the impression that the attorney was representing her and that she was exploring the possibility of placing BGS for agency adoption or private adoption. *Id.* at 737, 738. Appellee testified that the attorney stated to her that he would "take care" of her and that the options that she was contemplating were proper. *Id.*

Despite the options that appellee was contemplating her intention during the latter months of 1989 was to retain and raise BGS in the home of her paternal grandparents. *Id.* However, appellee's plans to move into her grandparent's home were terminated; until her grandparents decided that appellee could not reside with them she wanted to retain and raise BGS. *Id.* at 740. Appellee met with the attorney in December, 1989 and stated that even though she and BGS would have no place to live she still desired to keep BGS. Appellee testified that at this point the attorney chastised her for "changing her mind" since it was already December and he had invested a substantial portion of time searching for prospective adoptive parents for BGS. *Id.* at 741. At that time appellee believed that the attorney was still representing her since he "gave her a hug and told [her] that he was taking care of her." *Id.* at 742.

On December 14, 1989 BGS was born. At that time appellee felt that she "had to go through with the adoption." *Id.* at 744. Appellee testified that the attorney visited the hospital one and one-half days after the birth of BGS. Appellee also testified that the attorney told her that she could not see the baby but a doctor told her that she could not be stopped from seeing the baby; appellee did see BGS in the hospital. *Id.* at 746, 747. The attorney presented appellee with a consent form that, when signed by appellee, would enable him to remove BGS from the hospital. Appellee was troubled by the language in the form since it stated that she "desired" that

BGS be removed from the hospital and that her consent was "voluntary." *Id.* at 749. She testified that the attorney and the birth father urged her to sign the consent form and that she did so. *Id.* at 750. The attorney did not inform appellee that she retained the option of not signing the consent form. BGS was taken from the hospital and placed with the Nelsons; BGS has been and is presently living with the Nelsons.

In January, 1990 appellee initiated plans to regain BGS; she began to prepare a nursery at her parents' home and she told her father that she stored baby clothes, formula, baby food and other articles at the home of her paternal grandparents. On January 22, 1990, under pressure from her father, appellee signed consent to adopt forms. *Id.* at 752–763. On January 24, 1990, approximately six weeks after the birth of BGS, appellee telephoned the attorney and stated to him that she "did not want to go through with the adoption [and] that [she] wanted the return of [BGS]." *Id.* at 801. During February, 1990 appellee contacted the attorney three times and stated that she wanted BGS returned to her. Appellee testified that the attorney was upset with her and told her that the Nelsons "were extremely wealthy. They will tie this up in court for years. There's nothing you can do. You have signed the consent." *Id.* at 765. The attorney stated to appellee that it would be in her best interest to retain legal counsel. Appellee did not find out until June, 1990 that it was the Nelsons who were the preadoptive couple who were raising BGS.

In June, 1989, appellee began counseling with marriage and family therapist Carol McNamee. The weekly therapy centered around issues related to appellee's pregnancy. *Id.* at 312. Ms. McNamee testified that in May, 1990 appellee was "very distraught about not having her baby." *Id.* at 318. She was having "mood swings, lots of crying, sleeplessness, headaches, feeling impulsive, feeling somewhat out of control." *Id.* at 319. McNamee felt that appellee was in need of more help than McNamee could offer at that time. Appellee voluntarily admitted herself into Western Psychiatric Institute and Clinic in Pittsburgh on May, 11, 1990 and was released on June 7,

1990. After her hospitalization appellee continued sessions with McNamee. On July 20, 1990 appellee filed a Revocation of Consent to Adoption. The Nelsons then filed a petition to terminate appellee's parental rights to BGS.

Prior to the termination hearing trial counsel for the Nelsons requested access to appellee's psychiatric records regarding her hospitalization and the trial court denied the request. The trial court appointed Dr. Mark King, a psychologist, to determine appellee's capacity to parent BGS.[1] Dr. King evaluated and tested appellee, examined appellee's Western Psychiatric records and talked to Ms. McNamee. Dr. King prepared a report and testified at the termination hearing. During the hearing the trial court learned that appellee's counsel had provided the Western Psychiatric records to her expert witness, Dr. Herbert Levit, a psychologist. Subsequently, the trial court afforded counsel for the Nelsons access to appellee's Western Psychiatric records. The Nelsons' expert witness, Dr. Jeffrey Cohn, a psychologist, reviewed those records.[2]

The Nelsons first claim that the trial court erred in failing to hold a full and comprehensive termination hearing since it failed to admit all relevant evidence. The Nelsons specifically aver that the trial court should have admitted appellee's Western Psychiatric records and Carol McNamee's notes of the therapy sessions with appellee. The Nelsons also aver that the Western Psychiatric records provided to their counsel were incomplete.[3]

1. Although Dr. King was appointed by the trial court the Nelsons assumed responsibility for his salary and Dr. King was aware of that fact. N.T., 11/26, 28/90, 12/4, 13, 19/90, at 180.

2. The trial court had no direct access to the Western Psychiatric records.

3. The Nelsons aver that Western Psychiatric documents prepared concurrent with appellee's voluntary admission to the hospital were never forwarded to Dr. King or Dr. Cohn. We can not address this claim since none of the Western Psychiatric records were included in the record on appeal to this Court. However, arguendo, if we were able to address this issue we would have found it to be without merit since the admission documents would have been insignificant in comparison to the records relating to appellant's actual hospitalization.

In the instant case the Nelsons attempted to have appellee's parental rights terminated solely pursuant to the provision in 23 Pa.C.S. § 2511(a)(2) dealing with the alleged *incapacity* of a parent. Section 2511 states, in pertinent part,

(a) General rule.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . . . .

(2) the repeated and continued incapacity . . . of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity . . . cannot or will not be remedied by the parent.

Hence, the only issue to be resolved by the trial court was whether appellee was incapable of parenting BGS due to her alleged emotional and/or psychological deficiencies that could or would not be remedied.

Our scope of review, as well as the burden of proof in involuntary termination cases, is as follows. In cases in which there has been an involuntary termination of parental rights by the Orphan's Court, we must determine whether the decree of termination has been supported by competent evidence. *In re Adoption of J.J.*, 511 Pa. 590, 515 A.2d 883 (1986). If the decree is adequately supported by competent evidence, and the trial court's findings are not predicated upon capricious disbelief of competent and credible evidence, the adjudication of the trial court terminating parental rights will not be disturbed on appeal. *Id.* In a termination of parental rights proceeding, the burden of proof is upon the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so. *Id.* Unless the trial court abused its discretion or committed an error of law, its findings are entitled to the same weight given a jury verdict. *Id.* The trial court, as trier of fact, is the sole determiner of the credibility of witnesses. *Id.* Conflicts in testimony are to be resolved by the trier of fact and our Court can not disturb a decree of the Orphan's Court based upon

findings supported by the record unless Orphan's Court applied an incorrect legal standard. *Id.*

> In order to meet the clear and convincing burden of proof: The witnesses must be found to be credible, that the facts to which they testify are distinctly remembered and the details thereof narrated exactly and in due order, and that their testimony is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue. It is not necessary that the evidence be uncontradicted provided it carries conviction to the mind or carries a clear conviction of its truth.

*Id.,* 511 Pa. at 595, 515 A.2d at 886.

In termination cases an appellate court has a duty to ensure that the trial court has satisfactorily fulfilled the requirements of examining all evidentiary resources. *Matter of Adoption of Embick,* 351 Pa.Super. 491, 506 A.2d 455 (1986). The trial court must conduct a full hearing and set forth its decision in a full discursive opinion. *Id.* In numerous termination of parental rights cases both the trial and appellate courts of this Commonwealth have considered the testimony of psychiatrists and/or psychologists. *Id.; In re Adoption of Michael J.C.,* 506 Pa. 517, 486 A.2d 371 (1984); *In re William L.,* 477 Pa. 322, 383 A.2d 1228 (1978), *cert. denied* 439 U.S. 880, 99 S.Ct. 216, 58 L.Ed.2d 192; *In re Adoption of B.K.W. and D.M.W.,* 348 Pa.Super 333, 502 A.2d 235 (1985); *Matter of Adoption of Ferrante,* 334 Pa.Super. 53, 482 A.2d 1076 (1985). Where the mental or emotional condition of a parent is at issue in a termination case the trial court may examine psychiatric and/or psychological records relating to that parent. *Matter of Adoption of Embick, supra.*

In the instant case appellee's psychological records were both material and relevant and the trial court should have admitted the records into evidence. *Id.* While it would have been preferable for the trial court to have had direct access to the Western Psychiatric records the trial court was nonetheless apprised of the relevant substance of that source

of information through the testimony and reports of the court-appointed psychologist, Dr. King, appellee's expert, Dr. Levit and the Nelsons' expert, Dr. Cohn.

Dr. King gave extensive testimony regarding his examination of appellee and her Western Psychiatric records as well as a consultation that he had with Ms. McNamee. King found appellee to be intelligent but immature and impulsive. N.T., 11/26, 28/90, 12/4, 13, 19/90, at 197, 238. He found her to be overly dependent upon her father, and, that she was without the ability to have healthy relationships with other people. He also stated that she suffered from depression. Dr. King also stated that BGS had bonded with the Nelsons and the act of removing BGS from the Nelsons and placing the child with appellee would have caused BGS to become depressed and withdrawn. *Id.* at 221. Dr. King stated that appellee's therapy with McNamee and her hospitalization were a positive step in appellee's attempt to develop the ability to parent BGS. *Id.* at 244. Dr. King testified that it might have taken up to ten years of therapy to enable appellee to have become a competent parent to BGS. *Id.* at 249. Dr. King did find that appellee could have provided for the physical needs of BGS and could have provided love for the child. *Id.* Dr. King was of the opinion that, in all cases, once a child has been placed with preadoptive parents for approximately six months [4] then the child would be adversely affected if it was returned to the birth parent/s. *Id.* at 259. Dr. King informed appellee of his opinion, regarding the possible transfer of BGS, immediately before he administered an MMPI test to appellee. *Id.* at 261. Appellee's responses to the MMPI test figured heavily in Dr. King's assessment of appellee's mental health. The trial court found that Dr. King's views regarding the transfer of children from preadoptive to birth parents tainted his evaluation of appellee. Trial Court Opinion, 6/18/91, at 8.

Dr. Levit administered psychological tests and talked with appellee; he also reviewed her Western Psychiatric records. He found that appellee was not afflicted with psychosis or

---

4. At the time that Dr. King testified BGS had already been with the Nelsons for one year.

paranoia. He found her to be dependent, of average intelligence, mildly anxious and depressed, and internally hostile, yet he attributed these symptoms to the fact that she and BGS have been separated. He found that her hospitalization was the result of a situational depression, which is the direct result of a circumstance. N.T., 11/26, 28/90, 12/4, 13, 19/90, at 441. He opined that the instant circumstance was appellee's separation from BGS. Levit found no organic impairment and no emotional limitations that would have impaired appellee from competently parenting BGS, and, that she could have easily been integrated into therapy that would have facilitated her ability to cope with a transfer of BGS from the Nelsons. *Id.* at 455. The trial court "placed very little probative value on Dr. Levit's testimony." Trial Court Opinion, 6/18/91, at 5.

Dr. Cohn reviewed the Western Psychiatric records, was familiar with Dr. Levit's assessment of appellee and discussed with Dr. King the MMPI that he administered to appellee. Dr. Cohn gave detailed testimony refuting Levit's assessment of appellee's mental health. N.T., 11/26, 28/90, 12/4, 13, 19/90, at 565–658. Cohn stated that the tests that Levit performed upon appellee constituted an inadequate basis upon which to conclude that appellee could parent BGS. *Id.* at 610.

Ms. McNamee was not a psychologist or psychiatrist; her testimony was essentially that of a lay witness relating observations of appellee during the time period that appellee received counseling from McNamee. *Id.* at 310. She testified that at the time of the termination hearing appellee and her family had a more harmonious relationship and that the family was supportive of appellee's desire to regain possession of BGS. She also testified that appellee was not immature for her age. McNamee testified that appellee began counseling with her "to help ... sort out ... issues regarding the pregnancy and the decision that she had to make about the baby." *Id.* at 333. We fail to see how the session notes of this lay witness would have aided the trial court in its determination of whether appellee was incapable of parenting BGS due to psychological deficiencies. Therefore, the trial court did not err in failing to admit McNamee's session notes.

We now turn to the Western Psychiatric records. King and Levit reviewed those records and testified regarding their beliefs as to why appellee was hospitalized and the extent of her treatment at Western Psychiatric. The trial court is the sole determiner of witness credibility. *In re Adoption of J.J.*, *supra.* It found that King exhibited a bias in favor of the position taken by the Nelsons. Levit was appellee's expert and provided testimony in her favor. Hence, the trial court was provided with testimony representing diametrically opposed viewpoints regarding appellee's alleged psychological deficiencies.[5] Although the trial court did not afford much credence to either expert's conclusion this point is unimportant since the trial court *did* receive from them a comprehensive picture of appellee's hospitalization and appellee's emotional difficulties that precipitated her hospitalization. The relevant portions of the Western Psychiatric record were considered by the trial court, the trial court fully discussed in its opinions the findings of the experts, and, hence, the trial court conducted a hearing examining all evidentiary resources and set forth its decision in a full discursive opinion. *Matter of Adoption of Embick, supra.* Hence, the Nelsons' claim that the trial court failed to hold a comprehensive hearing and admit all relevant evidence is without merit.

The Nelsons' second claim is that a new trial is required since the trial court refused to admit into evidence and consider the records of appellee's psychiatric hospitalization and emotional counseling. We have already addressed these claims in the Nelsons' issue number one, *supra,* and based upon the reasoning therein find this issue to be without merit.

■ The Nelsons' third claim is that a new trial is mandated since the trial court rejected all expert psychological testimony and substituted "his own courtroom diagnosis as the basis of his decision." Appellants' Brief at 3.

■ The trial court did not reject the expert psychological testimony. It considered Dr. King's and Dr. Cohn's refutation

---

5. The trial court also had the opportunity to observe appellee for five days in the courtroom and on the witness stand.

of Dr. Levit's testimony. Although it "placed very little probative value on Dr. Levit's testimony" it nevertheless considered his testimony and did not discount it *in toto*. Trial Court Opinion, 6/18/91, at 5. Although the trial court found Dr. King's testimony "tainted" it nevertheless considered the testimony. The trial court, as finder of fact, is the sole determiner of credibility of witnesses. *In re Adoption of J.J.*, *supra*. Conflicts in testimony are to be resolved by the trier of fact. *Id.* The trial court properly determined the credibility of the several experts, and, after resolving conflicts in testimony and determining which testimony was credible and which was not, gleaned testimony from the experts that he factored into his decision regarding whether to terminate appellee's parental rights. Hence, the Nelsons are incorrect in their assertion that the trial court rejected all expert psychological testimony.

The Nelsons also aver that the trial court substituted its judgment, of appellee's psychological condition, in place of the experts' judgment. We disagree. As mentioned, *supra*, the trial court considered the testimony of all of the experts. The trial court did find much of Levit's testimony to be incredible and disagreed with King's "heightened concern with indicia of [appellee's] psychopathology from the MMPI [test] results; his dim prognosis for her recovery; and the discrepancies that existed between Dr. King's observations of [appellee] and those of the court itself." Trial Court Opinion 6/18/91, at 6. The trial court stated that it was impressed with appellee's ability to "cope" with the termination proceedings. This is not to say that the trial court based its final determination, not to terminate appellee's parental rights, solely upon its observation of appellee's demeanor during the hearing. The trial court's observation of appellee was but one of many factors that the trial court considered in its final determination. Regarding the MMPI, as mentioned, *supra*, immediately prior to administering the MMPI to appellee Dr. King informed her that a transfer of BGS from the Nelsons to appellee would have adverse effects upon BGS; the trial court determined, after listening to testimony regarding the purpose of utilizing

and methods of eliciting responses to an MMPI test, that King's statement to appellee affected her responses on the test, and, consequently, King's interpretation of the test results. Therefore, the trial court did not substitute its judgment in place of the experts' judgment; the trial court merely weighed all of the evidence and determined which evidence it found to be credible.

The Nelsons' fourth claim is that, "A new trial is required because the court misunderstood prior authority and improperly refused to admit and consider evidence of the child's unique circumstances and emotional needs as it related to parental capacity." Appellants' Brief at 41. The "unique circumstances and emotional needs" of BGS are the alleged adverse reactions (i.e., depression and withdrawal) that BGS may suffer if transferred from the Nelsons to appellee.

23 Pa.C.S. § 2511(b) states,

(b) Other considerations.—The court in terminating the rights of a parent shall give primary consideration to the needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

Our Court, in *In Interest of Coast,* 385 Pa.Super. 450, 561 A.2d 762 (1989) *(En Banc)*, stated,

[A] best interests [of the child in a termination proceeding] balancing analysis has no place in a determination of whether the statutory requisites of termination of parental rights have been met.... [T]he 'best interest' test conflicts with the purpose of a termination action.... Nor does ... the fact-finding [process] ... purport to determine whether the natural parents or the foster parents would provide the better home.

.    .    .    .    .

[A section 2511 termination proceeding] center[s] judicial inquiry on the welfare of the child rather than on the fault of the parent. ... [T]he focus [is on] the effect of the

parents' actions or omissions upon the child. The parents' behavior ... constitutes the operational fact, but in a broader sense. This effect upon the child has ... been expressed as the 'needs and welfare' of the child. It follows, then, that judicial inquiry necessarily looks at whether the needs of the child, both physical and emotional, are being served, for the purpose of determining whether or not the parent is performing his function. In this sense, the child's welfare is and always has been considered in Pennsylvania.... Our courts never meant by this kind of language that a 'best interests of the child' balancing test was to be employed; the analysis has, rather, always been an intensive fact-finding inquiry into whether the statutory provisions for termination had been met.... The focus and purpose of a termination hearing ... is whether parents have so failed in their duty that the State, because of its interest in the child's well-being, must strip the parents of their fundamental right.

.    .    .    .    .

[I]n the absence of sufficient evidence to satisfy the statutory requirements for involuntary termination, the question of the best interest of the child never arises.... The term 'child's needs and welfare' denotes neither a discrete factor which a court must consider, nor a discrete step in a termination adjudication. Rather, it denotes the minimum standard of care that is required of parents by the state.

.    .    .    .    .

[23 Pa.C.S.A.] § 2511(b) does not contain an additional ground for terminating parental rights; such grounds are contained in § 2511(a) only. Thus, *until the requirements of § 2511(a) are met, there is no need to consider § 2511(b).* [ (Citations omitted) (Emphasis added).]

*Id.,* 385 Pa.Superior Ct. at 458, 459, 460–61, 462, 465, 466, 561 A.2d at 766, 767, 768, 769, 770.

▇▇▇ In the instant case the trial court found that the Nelsons failed to establish by clear and convincing evidence that appellee, because of alleged psychological incapacity,

caused BGS to be without essential parental care, control or subsistence necessary for the physical or mental well-being of BGS. In sum, the trial court determined that the Nelsons failed to show that the requirements of 23 Pa.C.S. § 2511(a)(2) were met. If the requirements of § 2511 are not met, then the trial court may not inquire into the "best interests" of the child. *In Interest of Coast, supra.* Therefore, the trial court did not err in failing to consider whether BGS may become depressed and withdrawn if BGS is at some future time returned to the custody of appellee. The Nelsons' claim is without merit.

We affirm the order of the trial court denying the Nelsons' petition to terminate the parental rights of appellee.

APPEAL AT NO. 1119 PITTSBURGH 1991.

▆▆▆ The Nelsons claim that the trial court abused its discretion in granting in forma pauperis status to appellee [6] since the trial court failed to conduct an evidentiary hearing and failed to find that appellee was unable to pay "all or some of the costs" of the instant case. Appellants' Brief at 3. The Nelsons have not averred that they were prejudiced in any way by the trial court's decision to grant in forma pauperis status to appellee.

On January 15, 1991 the trial court denied the Nelsons' petition to terminate appellee's parental rights. On March 4, 1991 the Nelsons filed exceptions, and, appellee's brief in opposition to the Nelsons' exceptions was due on April 3, 1991. On March 21, 1991 appellee directly presented to the trial court a Praecipe to Proceed In Forma Pauperis. She averred that she was unable to pay the costs associated with the instant case. Appellee also presented an affidavit in support of the praecipe; said affidavit listed her past employment, property owned, debts and expenses for dependents. The Nelsons' counsel was provided with notice of the date that the documents would be presented to the trial court. Counsel for

6. In forma pauperis status permitted appellee to be relieved from paying *costs* associated with the instant case. Appellee's counsel had been providing free legal services during the Nelsons' appeal to this Court.

the Nelsons was present on March 21, 1991, when the praecipe and affidavit were presented to the trial court; counsel for the Nelsons was given copies of the praecipe and affidavit. The trial court stated that it granted appellee's "emergency" praecipe so that her counsel could "obtain and review transcripts covering five days of hearings on the termination of parental rights petition and prepare his response" to the Nelsons' exceptions to the denial of their petition to terminate appellee's parental rights. Trial Court Opinion, 11/19/91, at 1.

Pa.R.C.P. 240(b) states, "A party who is without financial resources to pay the costs of litigation is entitled to proceed in forma pauperis."[7] The mere filing of a praecipe for in forma pauperis status will not automatically establish the petitioner's right to proceed in that status. *Nicholson v. Nicholson*, 247 Pa.Super. 172, 371 A.2d 1383 (1977). The trial court must satisfy itself of the truth of the averment of inability to pay. *Id.* Once the opposing party denies the petitioner's averments the trial court must determine the truthfulness of the averments. *Koziatek v. Marquett*, 335 Pa.Super. 482, 484 A.2d 806 (1984). This Court will refer to the trial court questions regarding the veracity of a petitioner's allegations. *Id.; Nicholson v. Nicholson, supra.* If the trial court disbelieves the petitioner's averments it is incumbent upon the trial court to hold an evidentiary hearing. *Koziatek v. Marquett, supra.* However, if the trial court believes the petitioner's averments then there is no requirement that the trial court conduct an evidentiary hearing. *Id.; Nicholson v. Nicholson, supra.* Our Court will reverse the trial court's determination only if an abuse of discretion occurred. *Nicholson v. Nicholson, supra.*

During the five days of the termination hearing the trial court was apprised of numerous details regarding appellee's financial condition. Thus, even before appellee presented the trial court with her in forma pauperis petition the trial court was familiar with appellee's ability or inability to pay for the costs of the instant case. The Nelsons denied the truth-

7. Appellee's praecipe and affidavit complied with the requirements of Pa.R.C.P. 240(h), (i).

fulness of appellee's averments. However, the trial court, after reviewing the petition and utilizing the knowledge that it had gleaned from the five days of the termination hearing, determined that appellee's averments were truthful. Our Court will defer to the trial court regarding questions about the veracity of averments in an in forma pauperis petition. *Koziatek v. Marquett, supra; Nicholson v. Nicholson, supra.* Since the trial court believed the averments in appellee's petition it was unnecessary for the trial court to conduct an evidentiary hearing. *Id.* Furthermore, the Nelsons were not prejudiced by the actions of the trial court. Hence, we find that the trial court did not abuse its discretion in granting appellee's praecipe for in forma pauperis status and the Nelsons' claims are without merit. We affirm the order of the trial court granting in forma pauperis status to appellee.

Orders affirmed.

TAMILIA, J., files a concurring and dissenting opinion.

TAMILIA, Judge, concurring and dissenting.

I concur in the majority's determination that appellee was properly permitted to proceed in forma pauperis and despite the technical deficiencies that a proper hearing would have corrected, the extreme importance of this proceeding to the appellee and the lack of prejudice to the Nelsons warrants our erring in favor of appellee.

I strenuously object to the decision by the majority affirming the trial court in denying the Nelsons' petition to terminate the parental rights of appellee. It appears the trial court and the majority, in denying the petition to terminate, were effected by the pleas of a young woman to return her child rather than by the evidence which clearly met the test of clear and convincing evidence required to sustain a termination Order. *See Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).

The trial court substituted its judgment for that of competent psychological witnesses in an area where the expertise of the psychologist could not be second guessed by the court.

The court did not dispute the findings of Dr. King, the court-appointed expert, but determined those findings were not convincing in light of appellee's ability to muster a legal defense and take steps in preparation for the return of B.G.S. (the child subject of the termination proceeding). I submit that observation of the appellee in the court room, no matter how convincing, cannot substitute for evaluation and review of the history of appellee's vacillation about termination and subsequent involvement in therapy. The mental stability of appellee throughout this period was of vital importance and although the trial court asserts it had sufficient information to make a decision without the records of Western Psychiatric Institute and Clinic (WPIC), failure to admit this vital data precluded the court from having the full and exhaustive hearing that is required in a termination case. It also denied this Court critical information on the record necessary for appellate review.

The most troubling aspect of this case concerns the events that led up to the placement of B.G.S. While the court in its Opinion castigated the lawyer intermediary for his conduct in pursuing the adoption, and perhaps on this basis alone might have concluded the termination procedure was defective, it failed to give proper weight to the conditions and circumstances that led to placement. There was family intolerance to the mother retaining custody, she had no resources to maintain the child on her own, she and her parents initiated the placement process and throughout the placement, despite her ambivalence, she asserted her intent to proceed with adoption and to have the adoptive parents assume legal responsibility for the child. The evidence of this conduct is in conflict with the picture and testimony presented by appellee at trial. Also, despite several months of counseling from a mental health counselor, she found it necessary to admit herself to WPIC to undergo psychiatric treatment and medication. It was during her stay at WPIC that she instructed her counsel to revoke her consent to adopt and instead seek custody. This precipitated the petition for involuntary termination by the pre-adoptive parents. Her testimony about her

parents being abusive in her childhood and the vacillation and misrepresentation as to her intent regarding adoption point to instability which supports the findings by the court-appointed psychologist.

Dr. King holds both masters and doctorate degrees in the psychology of child development and has practiced and taught at the university level (University of Pittsburgh, clinical psychologist and professor of child development) for seventeen years. To hold, as did the trial court, that Dr. King had a bias against returning infants after six months placement in pre-adoptive homes ignores his expertise and evaluation of the mother in terms of her fitness to care for the child. The trial court's reliance on *In re Adoption of Stunkard,* 380 Pa.Super. 107, 551 A.2d 253 (1988), to negate Dr. King's use and reliance on the Minnesota Multiphasic Personality Inventory (MMPI) is misplaced and error. The MMPI, in the hands of a properly qualified expert, is a highly effective diagnostic/prognostic tool in combination with other data and information as was the case here. The birth mother, with no parenting skills, a history of emotional instability and lacking solid family support, who is pursuing educational career goals and attempting to obtain financial independence through employment, presents the degree of incapacity to parent that meets the proof of failure of parenting capacity required under 23 Pa.C.S. § 2511(a)(2):

> § 2511. Grounds for involuntary termination
>
> (a) General rule.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> .    .    .    .    .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

*Id.* The court refused to consider the records of the mother's hospitalization at WPIC as to both the precipitating cause of

her illness and her capacity to parent. The majority herein found the records both material and relevant and that they should have been admitted on the record (Majority Opinion, p. 9) but excused failure to do so by assuming the court acquired sufficient knowledge of their contents by indirection, through the testimony of Dr. King, appellee's expert, Dr. Levit and the Nelsons' expert, Dr. Cohn. This is unacceptable because we do not have those records available for our review. This is particularly important when the trial court (and apparently the majority) found Dr. King's views tainted, Dr. Levit's testimony to have little probative value and Dr. Cohn's testimony refuting Dr. Levit's and presumably supportive of Dr. King's. Under the circumstances appellant is justified in alleging that the trial court ignored all of the experts' testimony and made its own psychological/psychiatric finding.

It is not possible to determine from the trial record and the trial court's analysis precisely what basis the court used for its decision other than to find that its observations of appellee in court led to the conclusion she could provide adequate housing, clothing, food and love for the child. With the serious emotional and psychiatric instability evidenced by the record, that finding was inadequate to establish that the mother's incapacity had been remedied as required by section 2511(a)(2). I submit that this finding is not supported by the record. The infant has never been with the mother, her parenting capacity is unknown, there has been no bonding between them, her homemaking skills are unknown and she is now embarked on a program of work and self-improvement which will leave her little time to overcome the two-year deficit in child care and the trauma that transfer to her from the pre-adoptive parents will occasion in the child. *See Adoption of R.I.*, 468 Pa. 287, 361 A.2d 294 (1976); *Sarver Adoption Case*, 444 Pa. 507, 281 A.2d 890 (1971); *Schwab Adoption Case*, 355 Pa. 534, 50 A.2d 504 (1947). The Court here has failed to examine all of the evidence, as required by *Adoption of Embick*, 351 Pa.Super. 491, 506 A.2d 455 (1986), and the conclusions it drew as to the mother's fitness are conjectural and actually contradicted by the record.

The second consideration presented by this case and which was ignored by the trial court and misconstrued by the majority is the provision contained in section 2511(b), which provides:

(b) Other considerations.—The court in terminating the rights of a parent shall give primary consideration to the needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

The court, in refusing to consider best interest as it had not found the mother unfit, even if such a finding was justified, needed to consider the needs and welfare of the child. Since the ground for involuntary termination and the basis upon which the court made its analysis and finding was section 2511(a)(2), it could not disregard the needs and welfare of the child. Here, the court could not have determined on the record that the "neglect or refusal cannot or will not be remedied by the parent" (§ 2511(a)(2)) even if the court found the parent was fit. This is not a case where the child was removed by the state or there was a history of parenting or nonparenting which needed to be scrutinized and "the parent cannot or will not remedy those conditions within a reasonable period of time, [and] the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child" pursuant to section 2511(a)(5). That situation is the basis upon which *In the Interest of Coast*, 385 Pa.Super. 450, 561 A.2d 762 (1989), was decided and the law relating to best interest was established as pronounced in the vast majority of the cases for involuntary termination.

This case began with a consensual placement leading to voluntary termination under section 2502, *Relinquishment to adult intending to adopt child*. It resulted in an involuntary termination proceeding only after the child had been in placement with the pre-adoptive parents for a considerable period of time. The court's inquiry under these circumstances, since

the unity of the family never existed as is an important consideration in the usual involuntary termination case, should have focused on section 2511(b), giving primary consideration to the needs and welfare of the child. *In re E.M.*, 401 Pa.Super. 129, 584 A.2d 1014 (1991) (Orphans Court erred in failing to consider properly needs and welfare of children as discrete element under statutory scheme in terminating parental rights); *In re Quick*, 384 Pa.Super. 412, 559 A.2d 42 (1989) (Termination would meet needs and welfare of the child as removal from foster home would upset children's need for stability); *Appeal of Diane B.*, 456 Pa. 429, 321 A.2d 618 (1974) (A mere desire to perform parental duties is insufficient to preserve the parent-child relationship); *Adoption of R.I.*, *supra* (R.I.'s best interest would dictate who should have custody in such circumstances. To remove R.I. from her foster home might well create psychological and emotional distress similar to that caused by her initial removal from her natural parent). *See Sarver Adoption Case and Schwab Adoption Case, supra. In re Adoption of J.J.*, 511 Pa. 590, 607, 515 A.2d 883 (1981) (Judicial inquiry is to be centered on the best interest of the child rather than the fault of the parent).

*Coast, supra,* limited its discussion on best interest to whether a balancing test as between the two parents should be applied in evaluating the termination petition. The issue arose as to which of the two homes, the foster home or that of the natural parents, was better. Here, it is not a question of which of the two homes is better. There is prima facie case that the natural parent has never functioned as a parent during the child's lifetime, has shown no ability to provide a home for the child and is arguably mentally and emotionally unable to assume responsibility for the child. Discussion or debate at this point about the child's best interest and what it means in the context of the adoption law is academic. The statute does, however, mandate that "[t]he court in terminating the rights of the parent shall give primary consideration to the needs and welfare of the child." Section 2511(b), *Other considerations.* This writer, in his Concurring and Dissenting

Opinion in *Coast*, went to considerable length to explain how this provision was necessarily incorporated into a termination proceeding with documentation of similar requirements in other jurisdictions. The majority in *Coast* did not disagree but limited its discussion to the balancing issue and did not make any finding on the "needs and welfare" provision. *Coast*, therefore, is not authority for limiting consideration of the needs and welfare of the child under the facts of this case.

While it may be premature to find that the birth mother cannot remedy her incapacity to care for the child under section 2511(a)(2), the record does not support her present ability to do so. This does not mean that the Orphan's Court is presented with an either-or proposition where it must either terminate parental rights or place the child with the birth mother. Relying on section 2511(b), the court may bring into play the assistance of children's agencies and proceed to determine by proven methods of visitation and supervised placement, whether the child can be successfully returned to the appellee and whether she can establish an emotional and physical bond with the child which will avoid irreversible harm and detriment to her. Failing to accomplish this result, the court may reasonably proceed to terminate parental rights of B.G.S. The cases are legion where the appellate courts have found that the requirements of termination have not been met but refused to disturb the placement of the child when it would be traumatic to do so. *See Adoption of R.I., Sarver Adoption Case and Schwab Adoption Case, supra.* This most certainly comes within the requirement that the court, in terminating the rights of a parent, shall give primary consideration to the needs and welfare of the child.

For the above reasons, I would vacate the decree of the trial court and remand with instructions to obtain the birth mother's psychiatric records and give proper weight to the psychological testimony and consideration to the needs and welfare of the child and to do anything required thereafter to fulfill the mandate of section 2511(b).