615 A.2d 1355

### In re BABY BOY S.

### Appeal of DIANE S.

Superior Court of Pennsylvania.

Argued May 21, 1992.

Filed Nov. 9, 1992.

40

---

John F. Hooper, III, Pittsburgh, for appellant.

John Kardos, Pittsburgh, for appellee.

Mark J. Goldberg, Pittsburgh, for participating party.

Before ROWLEY, President Judge, and MONTEMURO and HESTER, JJ.

MONTEMURO, Judge.

This is an appeal from an order terminating appellant's parental rights to her now three year old son.

The background of this case is of a not unfamiliar type. In May of 1989, appellant, then eighteen years old, gave birth to a male child out of wedlock. The relationship which produced the child had been superficial and of short duration, and appellant's family, which is dysfunctional at best, could offer her no assistance. Therefore, after leaving the hospital, appellant, at the urging of a social worker, took up residence with Mrs. Ann Labish, who had opened her home as a shelter for abused and neglected children, and teenage unwed mothers. Appellant was aware of the Labish's facility, named New Arbor, through her sister's previous residence there.

Shortly after arriving at the home, appellant approached Mrs. Labish concerning the possible adoption of her child. After several conversations with the Labishes concerning her decision to relinquish the child for adoption, Pamela and Eugene Klein, who had earlier inquired about adoption through New Arbor, were selected to receive the baby. At appellant's request a meeting with the Kleins was arranged at their house. The meeting, which took place on May 18, 1989, lasted about an hour, during which time appellant was shown the house, and became acquainted with the Kleins. The next day, after having signed an entrustment agreement prepared by the Kleins' attorney, appellant left New Arbor.

On June 6, 1989, the Kleins filed, inter alia, a report of their intention to adopt appellant's child. In early July, appellant revoked the entrustment agreement, and filed a petition to show cause why the child should not be returned. Hearings were held, and the court ordered psychological evaluations of appellant and her fiancee, and a home study. At the same

time appellant's request that Children and Youth Services be involved, or that the child be returned to her were denied.

On March 15, 1990, appellant left the jurisdiction for Raleigh, North Carolina, without informing her family, the court, or counsel, who located her in late June. The Kleins meanwhile filed a Complaint for Custody, and petitioned for termination of appellant's parental rights. Hearings were held on these requests in August of 1990. In October of 1991, the trial court entered its decree terminating appellant's parental rights. This appeal followed.

Appellant has presented us with five issues, which we will address seriatim.

First, it is claimed that the Kleins lacked standing to proceed with a termination action. Appellant argues that because no blood relationship exists between the Kleins and the child, because they were never granted custody by the court, and because appellant revoked the entrustment agreement, the Kleins lacked the legal capacity to seek termination of her parental rights.

Section 2512(a)(3) of the 1980 Adoption Act, 23 Pa.C.S.A. § 2101 et seq., governs the matter of who is entitled to pursue the involuntary termination of another's parental rights.

(a) **Who may file.**—a petition to terminate parental rights with respect to a child under the age of 18 years may be filed by any of the following:

(3) The individual having custody or standing in loco parentis to the child and who has filed a report of intention to adopt required by section 2531 (relating to report of intention to adopt).

Despite appellant's insistence to the contrary, the Kleins stood in loco parentis to the child, having had that status conferred upon them by virtue of the entrustment agreement signed by appellant, and they had filed a report of their intention to adopt. Appellant's revocation of the entrustment agreement, despite the fact that it could by statute occur at any time prior to entry of a final decree of adoption, *Commonwealth ex rel. Grimes v. Yack*, 289 Pa.Super. 495, 433

A.2d 1363 (1981), nevertheless operated as an automatic eraser of standing no more than does any other revocation of consent to placement of the child out of the natural parent's control. For example, a temporary placement of a child in foster care is not automatically ended by the natural parent's attempt to retrieve the child, nor does the attempt deprive the agency to which the child was surrendered of the standing to contest the retrieval.

Appellant would have us believe that upon revocation of consent by the natural mother, the adoptive parents are faced with no option other than returning the child, and that with loss of physical custody standing is also compromised.[1] However, this court has concluded, albeit in a different context, that even removal of a child from the home of prospective adoptive parents does not preclude their protesting such removal, or from prosecuting a previously filed petition to adopt. *Adoption of Baby Boy McKnight,* 338 Pa.Super. 603, 607 n. 1, 488 A.2d 56, 58 n. 1 (1985). Standing to seek termination of parental rights has also been found in prospective adoptive parents who received custody from an agency, *Mitch v. Children and Youth Social Service Agency,* 383 Pa.Super. 42, 556 A.2d 419 (1989) *alloc. dn.,* 524 Pa. 620, 571 A.2d 383, and where the custodians of the child received him from relatives of the mother, with no agency acting as intermediary. *See, In re Adoption of J.M.E.,* 416 Pa.Super. 110, 610 A.2d 995 (1992). We have also ruled, in a case having certain features in common with this one, that where the natural mother has revoked her relinquishment of parental rights shortly after the child has been received by the adoptive parents, they can return the child, or, "if they ha[ve] any basis for doing so, [can] file[ ] a petition under the Adoption Act asking the court to terminate [the mother's] parental rights involuntarily." *Commonwealth ex rel Grimes v. Yack, supra.* The latter procedure was followed by appellants. *See also, In re Adoption of Michael J.C.,* 506 Pa. 517, 486 A.2d 371 (1984) (following a petition of habeas corpus filed by the natural mother for

---

1. No argument has been made equating the Kleins with foster parents, whose lack of standing to sue has been determined in *In re Crystal D.R.,* 331 Pa.Super 501, 480 A.2d 1146 (1984).

return of the child, the adoptive parents instituted a petition for involuntary termination of mother's parental rights). Appellees are, therefore, properly situated to bring the instant action, and the merits may accordingly be addressed.

■ Appellant's next claim is that the trial court erred in permitting the Kleins to retain the child, and in denying her request that during the proceedings the child be returned to her. The argument, that appellant was entitled to return of the child, is grounded in the assumption already disposed of, that the Kleins lacked standing to seek termination of appellant's parental rights. As we have already noted, the premise is invalid. So too is its corollary. Appellant provides us with no authority for the proposition that the trial court, when faced with a decision such as this case presented, is limited to those responses championed by one of the parties.

■ It is next argued that the court's decision to terminate appellant's parental rights under 23 Pa.C.S.A. § 2511(a)(2) lacked sufficient evidentiary support. Where a petition for termination of parental rights has been lodged, the proponent must produce clear and convincing evidence to support it.[2] *Id.* Our scope of review is then limited to determining whether the ensuing decree is reinforced by competent proof. *Id.* Therefore, the trial judge's actions in deciding a case, its findings of fact, its resolution of evidentiary conflicts, are to be accepted unless they are unsupported by the record, or reveal an abuse of discretion or an error of law. *Lookabill v. Moreland,* 336 Pa.Super. 520, 485 A.2d 1204 (1984).

In assessing the propriety of the result here, we find that our supreme court's decision in the case of *In re Michael J.C.*, *supra* provides an instructive analog. There, the 17 year old

2. Appellant argues that because she suffers from a mental handicap, a more stringent standard of proof is required here, and urges that the evidence must support termination beyond a reasonable doubt. However, our supreme court in *In re Adoption of J.J.*, 511 Pa. 590, 515 A.2d 883 (1986), concluded that application of the clear and convincing standard was appropriate even where mentally or physically impaired parents are involved. *See also, In re Adoption of B.J.R.*, 397 Pa.Super. 11, 579 A.2d 906 (1990).

natural mother executed a Consent to Adopt, and after a private adoption was arranged, revoked her consent, filing a petition for habeas corpus seeking return of the child, and triggering an inquiry into the statutory grounds for involuntary termination. The trial court found, despite appellant's limited contact with the child, and based on a psychological assessment of appellant, that termination was statutorily warranted. This court reversed, but our supreme court affirmed the decision of the trial judge, holding that the expert testimony concerning appellant's parenting ability was not merely speculative. It also found that the statute does not require a showing that "a putative parent have an opportunity to inflict substantial physical or mental harm upon a child before the state can intervene." *Id.* 506 Pa. at 525, 486 A.2d at 375; *see also, In re William L.*, 477 Pa. 322, 383 A.2d 1228 (1978). While it is true that the appellant in *Michael J.C.* demonstrated some undesirable personality traits which appellant herein does not, the case analysis applied to both must be the same.

Specifically, the trial court found that the grounds for the involuntary termination of appellant's parental rights are set forth in 23 Pa.C.S.A. § 2511(a)(2) and (b):

(a)(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

(b) Other considerations.—The Court in terminating the rights of a parent shall give primary consideration to the needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

In applying the provisions of (a)(2) to the case before it, the trial court properly noted that only after sufficient evidence is produced to fulfill the statutory requirements for

termination is the best interests of the child issue explored. *In re Adoption of J.J.*, 511 Pa. 590, 515 A.2d 883 (1986).

██ The trial court found, based on the psychological evaluations performed at the court's request by Dr. Donna Zaffey, that appellant's borderline intellectual function, her emotional immaturity and instability, leading to suicide threats in the presence of her sister and Mrs. Labish, plus her dependency and limited conceptual abilities were irremediable. Dr. Zaffey stated that appellant's deficiencies would prevent her from "maintaining stable employment, stable education functioning, or establishing realistic goals for herself," (N.T. 8.9.90 at 18) and that she was incapable of calculating the consequences of her own actions. (*Id.* at 134). Appellant offered nothing but her own self appraisal in rebuttal. *Compare, In re Adoption of B.J.R.*, 397 Pa.Super. 11, 579 A.2d 906 (1990). She also testified to her intention to seek employment in order to contribute to the child's support. As potential caretaker for the child, appellant testified about people whom she knew only on a first name basis, and would trust with the care of her child because, as the trial court noted, they "seemed nice." (T.C.O. at 7).

The psychologist noted her opinion that appellant did not possess:

> the intellectual, emotional, social maturity for the effective parenting skills necessary to adequately care for the child and provide the child with a stable home environment."

(N.T. 8.9.90 at 31).

Moreover, the expert felt that appellant would be unable to acquire the necessary skills in the foreseeable future. (*Id.* at 33, 121), and noted that any child subject to appellant's care could be expected to demonstrate the same limitations as appellant. (N.T. at 104) Dr. Zaffey explained that although appellant could benefit from training, she would never function at a higher cognitive level, and that even with training she would require constant supervision due to her inability to generalize or transfer skills from one situation to another. (*Id.* 94). These deficits and the low potential for improvement

were attributed to a paucity of resources stemming from arrested development. (*Id.* at 107). Further, according to the expert, appellant was not prepared to seek such training as might prove beneficial. When questioned as to where she would acquire information on raising her child, appellant stated that she would read books. Testing had revealed appellant's reading level at fourth grade. (*Id.* at 102) (*Id.* at 98–99) There was also testimony to the effect that nothing could compensate for appellant's intellectual deficit. (*Id.* at 95)

The trial court also noted that appellant's husband, Bryan Lashley, appeared little better equipped to deal with the child than appellant. Although not the father of this child,[3] Mr. Lashley declared himself prepared to regard it as his own. He had, in fact, fathered a child some months older than appellant's, and at the time of hearing had had little contact with it, providing no financial support. Mr. Lashley, too, is of limited intellectual ability, and his employment history is uncertain at best. The psychological evaluation of Mr. Lashley, although hampered by his failure to appear for two out of three scheduled sessions, did demonstrate emotional insecurity, immaturity and dependency much like appellant's, and he himself admitted prior problems with drugs and alcohol.

All of this information led the trial court to conclude that the statutory requirements for termination of parental rights had been met. Here, the trial court's conclusions comport with the holding in *Michael J.C., supra, compare, In re Adoption of B.J.R., supra* (parental rights of mother of special needs child terminated on the basis of mother's inability to remediate circumstances leading to child's removal).

Finally, there is the matter of appellant's departure from Pennsylvania. Appellant left Pittsburgh for Raleigh, North Carolina on March 15, 1990, without informing her family, or counsel, who was unable to locate her until June 20, 1990. She also notified no one else involved with her child of her change in residence, although she knew that there would be further court proceedings in the case. Moreover, since the

**3.** Appellant and Mr. Lashley have a child together, born May 26, 1990.

child's birth, appellant has made one attempt to see him. On this occasion, she called the Kleins and asked for access to the baby. She was not denied access, but was told by Mrs. Klein that she wished to discuss the matter with her husband, and would telephone appellant the next day. The number given by appellant to Mrs. Klein had been disconnected, a fact corroborated by Mr. Berman, the probation officer conducting the court ordered home study, who met with the same lack of success in attempting to reach her by telephone. Appellant made no other attempt to see the child, sent him no gifts or cards, and when he was past infancy, made no attempt to telephone him. She failed to petition the court for the entry of any schedule on which an acquaintance with her son could be established, despite the fact that no barrier erected by the court forbade her attempting such visits, and she made no effort to resist the trial court's dilatory handling of this case. While the trial court is much to blame for the timing of its actions here, the fact that psychological evaluations and home studies were ordered argues there that there was, at least initially, some hope of appellant's obtaining custody of the child. Appellant's own lack of interest in the actuality, as opposed to the idea of the baby, prevented her taking action. Normally, such a lack of involvement for only six months would be sufficient to justify termination. Here the period was over three years.

The cases involving termination of parental rights have always emphasized the responsibility of the parent to exhibit reasonable firmness in attempting to overcome such obstacles as may be encountered in maintaining the status of parent in order to be excused from performing parental duties. *See In re Baby Boy H.,* 401 Pa.Super. 530, 585 A.2d 1054 (1991). Here some of the obstacles were erected, albeit partially, by the court system itself. Appellant made no effort to combat these. She did, instead, leave the jurisdiction, without word to counsel, whose job was to protect the parental rights she was ostensibly so determined to preserve. This departure, in conjunction with her inert reaction to the trial court's delay,

bespeak not a parent interested in her child's future, but a child interested in her own immediate gratification.

The trial court in this case determined that the statutory criteria for termination of parental rights were met, and thereafter that the best interests of the child lay with the adoptive parents. Any other result would have placed in real jeopardy the life of Baby Boy S.. Even assuming that the transfer of a child, now almost three and one half years old, to a home with people he has never met, to a state far removed from this one, and into an environment where the dubious attentions of two parents with mental ages of twelve and eleven respectively must be shared with another child is not a priori immediately harmful to the child's well being, we need not, according to the Supreme Court in *Michael J.C.* permit appellant the opportunity to cause harm thereafter. We find no error of law or abuse of discretion in the trial court's ruling.

Appellant next argues that the trial court committed reversible error in several of its evidentiary rulings. As grounds for these assertions, appellant posits the need for "two discrete stages" in the resolution of the case (Appellant's Brief at 42), implying the necessity for two separate hearings: one to determine whether statutory grounds for termination exist, and a second to examine the best interests of the child. Consistent with this schema, she advances certain evidentiary rulings as errors in some measure because they were introduced at the wrong stage of proceedings.

■ We know of no rule in this Commonwealth [4] requiring the bifurcation of termination hearings, or the separation of evidence into the equivalent of liability and damages assess-

4. Appellant bases her argument on New York law, which does divide what is termed permanent neglect proceedings into fact-finding and dispositional hearings. *See, Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), citing Fam.Ct.Act §§ 622, 623. However, the Pennsylvania statute contains no parallel requirements. Moreover, *Adoption of R.I.,* 468 Pa. 287, 361 A.2d 294 (1976), on which appellant relies as authority for the bi-stage decision making process, only holds that in any given proceeding, the child's best interests cannot be considered until it is determined that the statutory requirements for termination are met. No second hearing is required.

ments. While appellant is correct in stating that grounds for termination and best interests of the child are separate considerations, there is no authority for evidentiary or other division of relevant information. The necessary distinctions are drawn by the trial court after hearing all the relevant evidence—there is no hiatus between two segments of the proceedings, an arrangement which would only further delay cases in need of the most expeditious handling.

Specifically, she assigns error to the court's having permitted testimony concerning appellant's family background, by having allowed Ann Labish to opine on appellant's ability as a parent, and by having excluded evidence concerning appellant's care of her child by Mr. Lashley, and concerning the home study done in Pittsburgh prior to appellant's departure. Appellant also complains that the trial court erroneously permitted evidence from non-experts on behalf of the Kleins, and as well, allowed Dr. Zaffey to testify by means of hearsay.

We must analyze appellant's claims on the basis of the proposition that the admission or exclusion of evidence is a matter for the trial court to determine, whose decisions in these matters will not be reversed absent an abuse of discretion, and actual prejudice. *Cohen v. Albert Einstein Medical Center, Northern Division*, 405 Pa.Super. 392, 592 A.2d 720 (1991). As to appellant's first contention, that the family background information educed during cross examination of appellant herself, and from Mrs. Labish was irrelevant, we disagree.

We will address each of appellant's claims briefly. The first evidence objected to was that concerning the mental illness of appellant's mother, the history of appellant's sister's pregnancies, and Mrs. Labish's testimony concerning the family's involvement with Children and Youth Services. All of this information was germane to the stability of appellant's family, and her lack of a social support system to assist her with the baby. Ultimately, this evidence demonstrated why appellant chose to take her child to residence at New Arbor rather than returning to her parents' home. Her sister's previous stay at New Arbor, and appellant's visits there, explain appellant's

initial familiarity with the shelter.[5] It was this sister whom appellant described as a source of advice, and whose residence in Raleigh, North Carolina prompted appellant's removal there. Sometime after appellant's arrival, however, she and the sister became estranged. Thus, with the exception of Mr. Lashley's presence, appellant recreated in North Carolina the same paucity of social support which led her to New Arbor.

 Appellant next claims that Mrs. Labish was allowed to testify as an expert on appellant's capability as a parent, although the witness lacked credentials which would allow her to so testify. The testimony given was based on personal observation of appellant's ability to handle her child. Despite appellant's claim that Mrs. Labish speculated on appellant's future ability to care for the needs of her child, the trial court sustained appellant's objection to that portion of her testimony. Appellant's further statement that the trial court found Mrs. Labish's assessment significant is not mirrored by the record.

 Appellant next argues that witnesses produced on behalf of the Kleins were permitted to render opinion evidence as to the prospective adoptive parents' background, capabilities, and effectiveness as parents. The main objection is not so much to their lack of expertise, but to their appearance at the "wrong" stage of the proceedings. For reasons already stated, we find no error in the witnesses' order of appearance. Further, the evidence proffered through these witnesses were also matters of empirical experience, not the subject of expert knowledge.

 Next appellant argues that her examination of witnesses was improperly limited on certain subjects. Specifically, she claims the trial court committed error in refusing to allow her to cross examine Dr. Zaffey concerning appellant's ability to care for the child born of appellant's marriage to Mr. Lashley. Our supreme court has found that evidence of a

5. It should be noted that when the social worker who interviewed appellant in the hospital, and who advised her going to New Arbor testified to essentially the same facts concerning appellant's family, appellant did not renew her objection.

mother's ability to care for a second child is irrelevant where her capability with regard to the first baby is in question. *See, Matter of Adoption of G.T.M.*, 506 Pa. 44, 483 A.2d 1355 (1984).

■ Appellant next complains that the trial court erroneously restricted her cross examination of Dr. Zaffey as to the home study conducted by Probation Officer Berman, and, in addition, refused to allow certain questions to be put to Mr. Berman himself. As appellant no longer resides in the home scrutinized by Mr. Berman, the results of that home study were, as the trial court found, not germane to her current situation. The trial court therefore properly limited questions concerning a document made irrelevant by appellant's relocation.

■ Finally, appellant argues that the procedures governing private adoption cases are unconstitutionally violative of the equal protection and due process clauses of both the Pennsylvania and United States Constitutions. The trial court noted that this issue was not properly pleaded, and timely notice not given the Attorney General as is required by Pa.R.C.P. 235(a). We see no reason to disagree.

Order affirmed.

ROWLEY, P.J., joins in this decision.

HESTER, J., files a dissenting opinion.

HESTER, Judge, dissenting.

I respectfully dissent from the majority's decision in this case for two reasons. First, I believe Mr. and Mrs. K. lacked standing to proceed on their petition to terminate the parental rights of Diane S. Second, assuming *arguendo*, they did have standing, I believe the trial court erred in concluding that Mr. and Mrs. K. established by clear and convincing evidence that grounds to terminate did exist.

The tragedy of this case arises from the despair of an infertile couple and the subtle coercion of a young, poor, uneducated unwed mother and was fueled both by unwise

legal maneuverings by counsel and a trial court which clearly failed to consider the effect of its rulings in this protracted battle for young Baby Boy S. For the reasons which follow, I would reverse the order terminating the parental rights of Diane S.

On May 8, 1989, Diane S., age eighteen and unmarried, gave birth to Baby Boy S. at West Penn Hospital in Pittsburgh. Three months earlier, Diane had withdrawn from high school as a result of embarrassment due to her pregnancy. When Diane was discharged from the hospital following the baby's birth, she and the baby went to New Arbor, a home for unwed mothers and their babies which is run by Ann Labish. Notes of Testimony ("N.T."), 7/20/89, at 114–15. Mrs. Labish had known Diane for approximately five years through Diane's sister, Christina, who previously stayed at New Arbor. While at New Arbor, Diane was not permitted to consult with family or friends and was not permitted to make telephone calls. While she was permitted to *receive* telephone calls, this privilege also was limited. *Id.* at 11, 40, 56, 130–31.

Diane testified that she felt very frightened about the prospect of caring for her child without money and the support of her family. She testified that even if her family were able to support her, she desired a more positive environment for her child. Her father was uncommunicative and worked two jobs, and her mother was confined to Woodville. Moreover, her parents were not married to each other; the record was unclear whether they ever had been married. *Id.* at 26. Diane was aware that the social worker at West Penn Hospital had recommended that Diane locate some type of community or social support, and it appears that Diane went to New Arbor to obtain that support. Joanne Moerschbache, the social worker from West Penn, testified unequivocally that she did not have concerns about Diane's ability to parent her child. *Id.* at 70. She stated that Diane displayed the skills necessary to meet the child's needs. *Id.* at 79. Ms. Moerschbache further testified that her concern centered on Diane's lack of community support. "It was identified that Diane's family support system was not strong and that additional community

supports could supplement the support system of her family that was lacking." *Id.* at 71.

As noted previously, Diane's stay at New Arbor could hardly be described as supportive. A reading of the testimony from the July 20, 1989 hearing reveals that subtle coercion was applied by Ann Labish to encourage Diane to consent to the adoption of her child. As previously noted, Diane testified to the severe limits placed on her communication with family and friends. The following testimony is most revealing concerning the coercion applied by Labish. "They started pressuring me saying you should do this, this is the right thing to do. They asked me if I was sure about it. I said, no; and I said I wanted to talk to my family, and I wasn't allowed." N.T., 7/20/89, at 40. Moreover, Ann Labish admitted that she threatened to call Children and Youth Services if Diane attempted to leave New Arbor with her baby. *Id.* at 154–58. When Diane displayed fear and uncertainty in caring for her infant, Ann Labish produced the perfect family to raise the child. In fact, the minute Diane told Ann Labish "she was thinking about placing the baby for adoption," Labish indicated she had a family ready to adopt the child. *Id.* at 127–28. At 5:00 p.m. the next day, Labish read from the file she had concerning Mr. and Mrs. K. Diane indicated a desire to meet them, and Labish arranged a meeting at their home that evening. While at the home of Mr. and Mrs. K., Diane executed an entrustment agreement prepared by counsel for Mr. and Mrs. K., by which she transferred custody of Baby Boy S. to Eugene and Pamela K. Diane was unrepresented by counsel at that time. *Id.* at 16. Diane left New Arbor the following day, May 19, 1989, and Mr. and Mrs. K. took custody of eleven-day-old Baby Boy S.

Diane testified that she wavered in her decision to give her child up for adoption the very next day. She contacted a lawyer and made every attempt within her limited means to prepare for her son's return. Diane was unable to live with her parents and wanted a better environment for her child. Therefore, she rented an apartment and enrolled in a six-month program at Cleveland Institute of Technology to obtain

her G.E.D. and a diploma for learning word processing. *Id.* at 17–19.

On June 6, 1989, Mr. and Mrs. K. filed a report of intention to adopt Baby Boy S. Immediately above their signatures on that document appears the following statement:

We acknowledge that we have been advised or know and understand that the natural parent may revoke the consent to the adoption of this child until a court has entered a decree terminating the parental rights and, unless a decree terminating parental rights has been entered, the natural parent may revoke the consent until a court enters the final adoption decree.

Later that month, counsel informed Mr. and Mrs. K. that Diane was seeking the return of her son. On July 7, 1989, counsel for Diane presented a revocation of the entrustment agreement and consent to the adoption,[1] followed by a petition for a citation to show cause why Baby Boy S. should not be returned to her, filed on July 11, 1989. This was but forty-seven days from the date of the entrustment agreement and well within the six-month statutory period. The orphan's court scheduled a hearing for July 20, 1989. Mr. and Mrs. K. refused to return Baby Boy S. to Diane, and instead, their counsel filed a motion for a psychiatric evaluation of Diane, a petition to appoint a guardian *ad litem* for the child, a motion for a home evaluation of Diane S., a petition for the involuntary termination of the parental rights of Diane S., and an answer to Diane's request for return of Baby Boy S. It appears that the orphan's court granted the motions for psychiatric evaluation and home evaluation of Diane in an off-the-record discussion in chambers after the hearing; however, the record reflects the filing of these orders on September 7, 1989.

Mr. and Mrs. K. also filed a complaint for custody of Baby Boy S., which was stayed pending the outcome of the proceedings in orphan's court. Since the orphan's court refused to

1. Both parties represent that the revocation of the entrustment agreement was presented to the court on July 7, 1989, however the record reflects the filing of this document on July 25, 1989.

rule upon Diane's petition for a citation to show cause why Baby Boy S. should not be returned to his natural mother, Baby Boy S. has remained in the care and custody of Mr. and Mrs. K. Following the completion of the psychiatric and home evaluations of Diane, a conciliation was held on November 16, 1989. Thereafter, on December 5, 1989, the orphan's court ordered the psychiatric evaluation of Bryan Lashley, Diane's fiance, whom she subsequently married on February 14, 1990. N.T., 8/1/90, at 211. A second conciliation was held on March 7, 1990. The petition to appoint a guardian *ad litem* for Baby Boy S. finally was granted by the orphan's court on April 3, 1990. The child, however, remained in the home of Mr. and Mrs. K.

A hearing on the petition to terminate Diane's parental rights was scheduled for June 12, 1990. Counsel for Mr. and Mrs. K. was unable to locate Diane for the purpose of personally serving notice of the June 12 hearing. Proof of service by publication was filed on June 1, 1990. Counsel for Diane requested a continuance which the court granted. Counsel located Diane in Raleigh, North Carolina, in July. On August 1, 9, and 10, 1990, a hearing was held on the petition to terminate Diane's parental rights in Baby Boy S. The orphan's court thereafter ordered counsel for the parties to file briefs. Finally, on August 8, 1991, *one year* after the hearings held on the matter, the orphan's court filed a decree nisi terminating Diane's parental rights. Exceptions were filed and denied, and the court filed a final decree on October 4, 1991. This appeal followed.

Appellant raises the following issues for our review:

[Mr. and Mrs. K.] lacked standing to seek involuntarily judicial termination of respondent's rights in Baby Boy [S.].

The court erred in permitting [Mr. and Mrs. K.] to retain the child, and in denying [Diane's] request that the child be returned to her during the proceedings, following her revocation of the entrustment agreement.

The court lacked sufficient, competent evidence in the record to involuntarily terminate the parental rights of [Diane S.] under 23 Pa.C.S. section 2511(a)(2).

The court erred in admitting evidence and testimony on behalf of [Mr. and Mrs. K.] and in rejecting evidence and testimony favorable to [Diane S.].

The procedures adopted in Pennsylvania for the involuntary termination of parental rights in "private adoption" cases do not provide birth parents with sufficient protection of their natural rights in their children, in violation of the Constitutions of the United States and the Commonwealth of Pennsylvania.

As noted previously, I believe the issue of whether Mr. and Mrs. K. had standing to proceed on their petition to terminate the parental rights of Diane S. has merit. The orphan's court's sole reference to this issue is the following statement: "Throughout the entire period of the litigation, Baby Boy [S.] has remained in the care and custody of [Mr. and Mrs. K.], who have stood in loco parentis to him. By the terms of 23 Pa.C.S. 2512(a)(3), [Mr. and Mrs. K.] clearly satisfy the requirements necessary to vest this Court with jurisdiction." Trial court opinion, 8/8/91, at 1. To address this issue, it is necessary to focus on the language of section 2512(a) of the Adoption Act, 23 Pa.C.S.A. §§ 2101 *et seq.* That section sets forth who may file a petition for involuntary termination of parental rights.

§ 2512. **Petition for involuntary termination**

(a) **Who may file.**—A petition to terminate parental rights with respect to a child under the age of 18 years may be filed by any of the following:

(1) Either parent when termination is sought with respect to the other parent.

(2) An agency.

(3) The individual having custody or standing in loco parentis to the child and who has filed a report required by section 2531 (relating to report of intention to adopt).

23 Pa.C.S.A. § 2512(a). It is clear that neither subsection (1) or (2) apply instantly. As to subsection (3), we previously have held that custody, as that term is used in § 2512(a), refers to legal custody, not physical custody. *In re Crystal D.R.*, 331 Pa.Super. 501, 480 A.2d 1146 (1984); *In re Adoption*

*of J.F.*, 392 Pa.Super. 39, 572 A.2d 223 (1990). Since Mr. and Mrs. K. did not have legal custody of Baby Boy S., it must be determined whether Mr. and Mrs. K. stood in loco parentis to Baby Boy S., within the meaning of the statute.

In *In re Adoption of Crystal D.R.*, *supra*, we held that foster parents, who have been awarded custody of a child by an agency which has obtained legal custody of the child, do not have standing to petition to terminate the rights of the natural parents of the child. Recently, in *In re Adoption of J.M.E.*, 416 Pa.Super. 110, 610 A.2d 995 (1992), we distinguished *Crystal D.R.*, holding that the appellants in that case truly stood in loco parentis to the child. The significant factor for this court in *J.M.E.* was our examination of the intent of the child's aunt, who had legal custody of the child, when placing the boy with the appellants. A review of the record made it clear that the placement of J.M.E. with the appellants was to be permanent, and they were to raise the child "until he's grown."

The majority cites *J.M.E.* to support its position that appellees in the instant case have standing. A reading of *J.M.E.* makes it clear, however, that the overriding factor in that case was that "all parties intended that [the child's] placement with appellants would be permanent; indeed, the expectation clearly is that [appellants] are to be the only 'parents' [the child] would ever know." *Id.*, 416 Pa.Super. at 117, 610 A.2d at 999. In the present case, since Diane changed her mind about placing the child for adoption the day after she left New Arbor, and then withdrew the entrustment agreement, it is clear that the placement of Baby Boy S. was not intended to be permanent. Thus, our decision in *J.M.E.* offers no support for the majority's position, and is, in fact, in direct conflict with it.

Baby Boy S. was never in appellees' care permanently. While the orphan's court suggests that appellant displayed only "second thoughts" and "whimsical parental behavior," trial court opinion, 10/4/91, at 4, the record reveals that Diane was confused and uncertain about her decision to place her child for adoption from the start. I previously chronicled the

subtle coercion applied by Ann Labish regarding this decision. Diane's desire to regain custody of her son is manifested clearly by her actions from the day after she left New Arbor.

I am convinced by appellant's argument that any right Mr. and Mrs. K. had in Baby Boy S. was acquired merely by the entrustment agreement which Diane revoked within forty-seven days of its execution. It is absolutely clear that the consent to an adoption as is contemplated by 23 Pa.C.S.A. § 2711 may be revoked at any time prior to the entry of a final decree terminating parental rights or granting an adoption. *Commonwealth ex rel. Grimes v. Yack*, 289 Pa.Super. 495, 433 A.2d 1363 (1981). I agree with appellant that any claim or entitlement that Mr. and Mrs. K. had in Baby Boy S. by virtue of the entrustment agreement terminated upon the revocation of that agreement. I disagree with appellees that there is any significance to the fact that they filed their report of intention to adopt before appellant revoked the entrustment agreement. I also disagree with appellees' claim that the fact that Diane could revoke her consent to the adoption at any time prior to the entry of a valid decree is immaterial to the determination whether appellees had standing to petition for the termination of Diane's parental rights. Appellees' argument misses the point. They assert that the fact that appellees "stand in loco parentis to the child and have filed their Report of Intention to Adopt confers upon them standing to petition for the termination of [appellant's] rights." Appellees' brief at 14. The revocation of the entrustment agreement terminated the possibility that appellees stood in loco parentis to the child. From the time of the revocation, *appellees have not had any recognized legal relationship to the child.*

I find guidance in *K.N. v. Cades*, 288 Pa.Super. 555, 432 A.2d 1010 (1981). A child was born to sixteen-year-old unwed J.N. Before the child's birth, J.N. agreed to the private adoption of the child and signed a consent three days after the baby's birth. Two months later, J.N. and her mother informed the intermediary that J.N. wanted her baby back. A week later, J.N. revoked her consent. After an evidentiary hearing, the lower court held that J.N. had revoked her

consent to the adoption and ordered that the child be returned to her. The adoptive parents appealed to this court. One of the issues in that case concerned the settled law that consent to adoption may be withdrawn at any time before the entry of the final decree of adoption. Parenthetically, I observe that the orphan's court in the instant case never made a specific finding on the revocation but chose to ignore it and proceed on the petitions advanced by appellees. We stated in *Cades*,

> [W]e are aware that our decision—whatever it may be—will bring grief, either to appellants or the child's mother. Nevertheless, nothing in this case suggests to us that appellants' solution would be better than that dictated by the settled law. The relationship between parent and child should be broken only with the greatest reluctance. Here, we think it would be most unjust to hold the mother to her promise, as appellants would have us do. She was very young. She consented to give her child for adoption only in response to her parents' urging. She received no outside or professional counseling to guide her in making so agonizing a decision. And she only made the decision after being assured that she had six months within which to change her mind and get her child back. We do not question appellants' love for the child. However, they took the child knowing that the mother might change her mind.

*Id.*, 288 Pa.Super. at 566, 432 A.2d at 1016. It is clear that *Cades* has striking similarities to the instant case. For example, appellant herein testified that she believed that even though she signed the entrustment agreement, she retained the right to change her mind. She stated she believed "she still [has] legal rights." N.T., 7/20/89, at 15. Unfortunately, everyone ignored her attempts to enforce them. In fact, the one factor that stands out in this case is the unfortunate inaction by the lower court. I believe the delay in this case is the overriding factor which has made it so difficult for this court to do what it legally is required to do. However, we simply cannot allow the dilatory actions of the orphan's court to erase this young mother's right to her son.

The majority's reliance upon *Commonwealth ex rel. Grimes v. Yack*, 289 Pa.Super. 495, 433 A.2d 1363 (1981), is misplaced. Our reference therein to alternative ways the adoptive parents could proceed was dicta and provides no precedent for the issue presented in the instant case. Similarly, I believe the majority's reliance on *In re Adoption of Michael J.C.*, 506 Pa. 517, 486 A.2d 371 (1984), both in relation to the issue of standing and to the merits, is misguided. First and foremost, whether the adoptive parents in *Michael J.C.* lacked standing to proceed with their petition to terminate the natural mother's parental rights was *not* an issue raised before the court of common pleas or on appeal. The fact that the case proceeded can be viewed as nothing more than an acknowledgement that the court addressed only the issues raised by the parties, as indeed it should have done.

Moreover, the majority, in relying on *Michael J.C.*, states that the appellant therein "demonstrated some undesirable personality traits which appellant herein does not . . ." and then proceeds to ignore these very significant differences. The natural mother in *Michael J.C.* was physically abusive not only to her own mother but to children for whom she baby-sat. There also was evidence that indicated a pattern of illegal drug and alcohol abuse by the natural mother, resulting in her hospitalization for a drug overdose after consuming alcohol and "angel dust." The natural mother therein also was treated at a mental hospital as a result of suicide threats, and she was diagnosed as drug dependent, alcohol dependent, and a depressive neurotic. There was testimony that her apartment was uninhabitable, with dog feces on the floor and walls covered by obscene language. I cannot agree that while appellant herein does not possess these same "undesirable personality traits . . . the case analysis applied to both must be the same." Majority opinion at 1359. It was these very significant, indeed horrific, personality traits that persuaded the Pennsylvania Supreme Court that the natural mother's parental rights should be terminated in *Michael J.C.* In this case, the only "pattern of conduct" that can be attributed to

appellant is poverty and youth, which now has resulted in the system's denial of her right to her child.

Donna Zaffey, the court-appointed psychologist who examined appellant and whose fees were paid by Mr. and Mrs. K., N.T., 8/1/90, at 6, clearly relied on appellant's poverty in assessing Diane's parenting skills. Dr. Zaffey described Diane as "a person whose development was limited, and who had come from an impoverished background with few cultural and educational experiences to stimulate growth and development." *Id.* at 17. Mrs. K. on the other hand is thirty-eight years old, with a bachelor of arts degree and a master's degree in reading, who taught school for fourteen years before leaving her job to stay home with Baby Boy S. *Id.* at 137–38. She and her husband, who also has a bachelor of arts degree and a master's degree in education, live in a two-story, four bedroom house. *Id.* at 143.

The majority mischaracterizes Dr. Zaffey's testimony concerning Diane's intelligence by confusing emotional maturity and intellectual functioning. Zaffey reported that Diane had a measured IQ in the below-average range, but did not testify that Diane had the mental age of a twelve-year-old child, as the majority states. Dr. Zaffey testified, instead, that Diane's emotional maturity corresponded to a twelve or thirteen-year-old adolescent, and this was based upon personality assessments. *Id.* at 64, 71–79. Such a distinction is critical, for the expert testimony was not that Diane had the intellectual capacity of a twelve-year-old, which is an objective determination based upon an IQ assessment. Rather, it was Zaffey's subjective impression that Diane had the emotional maturity of a twelve or thirteen-year-old based upon a personality test. *Id.* at 72. Moreover, any potential for **emotional** growth required additional testing, which Dr. Zaffey did not administer. *Id.* at 78.

Finally, Dr. Zaffey's assessments of Diane's ability to parent focused not upon the minimal level of care required, but upon an **optimum** level of emotional and social advancement. In fact, Zaffey stated, "I feel that in looking at a child, that a child is owed the opportunity to develop maximally rather

than minimally." *Id.* at 106. When asked if Diane would ever have "sufficient ability to satisfy minimal physical and emotional requirements for a child if she were to raise him," Dr. Zaffey replied, "I feel that she does not have the ability to raise the child **in the best possible way.**" *Id.* at 120 (emphasis added). I believe a fair reading of the record establishes that Dr. Zaffey weighed the advantages of age, wealth, and education against the disadvantages of youth, poverty, and lack of education, to make her recommendation that Diane could not provide for the needs of Baby Boy S. There simply is nothing in the record that establishes that Baby Boy S. would have been without essential parental care had he been returned to his natural mother when she initially sought his return. *Compare In re Adoption of B.G.S.,* 418 Pa.Super. 588, 614 A.2d 1161 (885 and 1119 Pittsburgh, 1991) (filed August 17, 1992) (Trial court properly denied adoptive parents' petition to terminate parental rights of nineteen-year-old unwed mother, who signed consent to adopt in hospital two days after baby's birth, and who filed revocation of consent seven months later, because adoptive parents failed to prove that requirements of 23 Pa.C.S. § 2511(a)(2) were met).

The tragedy of this case is that the orphan's court refused to rule upon appellant's petition to remove her child from the home of Mr. and Mrs. K., and the boy, now three years old, remains there to this day. The orphan's court had the opportunity as well as the obligation to remove the child from this home when the baby was only two months old. Instantly, matters were delayed at all times by the legal maneuverings of counsel for appellees, or the orphan's court, with the exception of the two-month delay occasioned by appellant's relocation to North Carolina and the concurrent move of her counsel's law office.[2] N.T., 8/1/90, at 236. Most troublesome is the lower court's one year delay in filing its decree termi-

---

2. Contrary to the majority's characterization of appellant's move to North Carolina as being surreptitious, appellant testified that she tried to notify her attorney, and her attorney testified that he indeed did change his telephone number and move his law office to another location at that time. N.T., 8/1/90, at 236, 294–97.

nating appellant's parental rights from which this appeal is taken.

The expressed reasoning of the orphan's court also is disturbing. In the original opinion the court states: "It is clear from the testimony that Diane S.'s lack of involvement with the baby is consistent with her own family experience." The record unequivocally demonstrates that Diane's lack of involvement with her son stems solely from the court's own failure to recognize the mother's revocation of the entrustment agreement. The judge then proceeded to use that court-created situation as a grounds for termination. In the supplemental opinion the court states: "Accordingly, the claim that the baby should have been removed from the K.'s home and care during the pendency of this action is mindless and typical of the shallow reasoning powers of the birth mother." The court conveniently ignored the fact that the legislature preserved Diane's right to revoke her entrustment agreement and that that right has been recognized by the Courts of Pennsylvania in *K.N. v. Cades, supra*. However, the mother's continuing unsuccessful effort to exercise that right has been described by the court as "mindless" and "shallow" and then used as additional grounds for termination of her parental rights.

This case does not present a natural mother who exhibited repeated and continued incapacity, abuse, neglect, or refusal which caused her child to be without essential parental care, as the trial court concluded pursuant to 23 Pa.C.S. § 2511(a)(2). It presents only a young, poor, unwed mother who was coerced into placing her child for adoption, and who became the victim of questionable legal maneuverings of counsel, a desperate, infertile couple, and a trial court whi disregarded its duty to proceed in a timely way. Due to the trial court's dilatory action, Baby Boy S. is now over three years old and knows no parents other than Mr. and Mrs. K. However, this court should not perpetuate the injustices already inflicted by affirming the trial court's termination of appellant's parental rights when there is no legal basis to do so.

Our reversal of that order would not necessarily place Baby Boy S. in appellant's custody, as that determination is governed solely by the best interest of the child, a separate issue from whether clear and convincing evidence was presented to terminate appellant's parental rights. There exists a wealth of services available to appellant and Baby Boy S. This court cannot turn its back on its duty to uphold the law, even when our sympathies for the parties and the child are drawn to the surface in such an agonizing way.

Thus, I would reverse and remand to the distinguished President Judge of the Court of Common Pleas of Allegheny County, Paul R. Zavarella, with the request that he refer this matter to a judge other than the one involved in the within termination litigation.