In the Interest of KELLY STEVENS
(D.O.B. 11/15/86).

Robin REED, Petitioner Below,
Appellant-Cross/Appellee,

and

Charles and Mary Conner, Would be
Intervenors Below, Appellants,

v.

Thomas P. DILLARD, Respondent Below,
Appellee–Cross/Appellant.

Nos. 262, 276, 1993.

Supreme Court of Delaware.

Submitted:  Sept. 13, 1994.
Rehearing en Banc:  Dec. 2, 1994.
Decided:  Jan. 13, 1995.

Kathryn J. Laffey (argued), Erhart & Laffey, Wilmington, for appellant Robin Reed.

Kevin Gross (argued), Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, for appellee and cross appellant Thomas P. Dillard.

Joel D. Tenenbaum (argued), Woloshin, Tenenbaum & Natalie, P.A., Wilmington, for appellants Charles and Mary Conner.

P. Clarkson Collins, Jr. and Barbara D. Crowell (argued), Morris, James, Hitchens & Williams, Wilmington, Guardians ad litem, for Kelly Stevens.

Before VEASEY, C.J., WALSH, HOLLAND, HARTNETT and BERGER, JJ., constituting the Court en Banc.

WALSH, Justice.

The opinion in this case dated October 27, 1994, which was released after argument before a panel of three justices and which affirmed the decision of the Family Court, is withdrawn. The following opinion of the Court *en Banc* is substituted.

In this appeal from the Family Court, we confront the vexing question of whether the best interest of a child who has been in the custody of putative adoptive parents since

birth should prevail over the claim of her biological father to assert his parental rights. The Family Court concluded that the statutory threshold for terminating the father's parental rights had not been established and despite the delay resulting from the protracted litigation between the parties, here and in Pennsylvania, the father's parental rights cannot be severed. We essentially affirm the Family Court's interpretation of the legal test for the termination of parental rights under Delaware law. We conclude, however, that the record before the Family Court is not complete on the question of (i) the biological father's good faith efforts to establish substantial contacts with the child and (ii) whether there was a "settled purpose to abandon." That record, as presently constituted, does not support the Family Court's determination concerning the father's subjective intent to establish a genuine parental relationship. Events which occurred after the Family Court's decision, among other things, require full consideration if a just result is to be achieved in this unusual case. Accordingly, we remand for further proceedings.

I

The chronology which underlies this dispute is complex but a full recounting is necessary to appreciate the background of this appeal. In November, 1985, Thomas Dillard ("Dillard")[1] and Robin Reed ("Reed") met and began dating while working in Wilmington. When Reed became pregnant the following February, the two discussed various options but came to no conclusion. Reed, claiming to be affronted by Dillard's indecision, decided to carry the child to term and immediately place the baby for adoption. Although the record is not clear concerning why an out-of-state adoption agency was selected, Reed made arrangements to place the child for adoption through Golden Cradle, a licensed, non-profit adoption agency in Pennsylvania.

Kelly Stevens ("Kelly") was born on November 15, 1986, at a Pennsylvania hospital, under arrangements apparently made by Golden Cradle. Dillard was advised of the birth by Robin's family and, together with his parents, he visited the child briefly at the hospital two days later. At that time, Reed advised Dillard that she planned to place the child with Golden Cradle for transfer to the prospective adoptive parents the following day unless he made other arrangements. Dillard did nothing. On November 18, 1986, Kelly was delivered to Golden Cradle and immediately placed with the couple who had contracted with Golden Cradle for the adoption, Charles and Mary Conner ("the Conners"). Kelly has lived with, and become a part of, the Conner family since she was three days old and continues to reside there. Although the record is not clear on the timing, the Conners were approved as prospective adopting parents by the Delaware Division of Child Protective Services ("DDCPS").[2]

Shortly after Kelly's birth, Golden Cradle attempted, unsuccessfully, to secure Dillard's voluntary relinquishment of his parental rights in favor of the adoption by the Conners. According to Reed, Dillard stated that he would not cooperate with Golden Cradle, but that he would not oppose the adoption, either. Reed voluntarily relinquished her rights to Kelly on January 8, 1987. On March 3, 1987, after consulting with a Pennsylvania lawyer, Dillard apparently changed his mind. He filed a petition for custody and/or visitation in the Court of Common Pleas Orphans' Court Division (the "Orphans' Court") in Montgomery County, Pennsylvania. On April 15, 1987, Golden Cradle filed a petition in the same court to terminate Dillard's parental rights, pursuant to 23 Pa. C.S.A. §§ 2511(a)(1) and (a)(2), alleging that Dillard had shown a settled purpose of relinquishing his parental claim and/or had refused to perform his parental duties for a period in excess of six months. When Reed

---

1. We have adopted pseudonyms for all parties and have attempted, to the extent feasible, to extend confidentiality to all aspects of this appeal. Supr.Ct.R. 7(c).

2. Apparently, pursuant to the Interstate Compact on the Placement of Children, 31 *Del.C.* § 381, a child born out of state may be placed for adoption with a Delaware resident under supervision of an adoption agency licensed by the State.

learned of Dillard's effort to secure custody, she petitioned to vacate the decree terminating her parental rights, claiming that her relinquishment was conditioned upon Kelly's adoption by the Conners.

The Orphans' Court stayed the adoption proceedings as well as Dillard's custody petition but did restore Reed's parental rights. After an evidentiary hearing, the Orphans' Court denied Golden Cradle's petition to terminate Dillard's parental rights. The court ruled that since Dillard initiated a custody petition within three months of Kelly's birth, there was not sufficient evidence to demonstrate his relinquishment of a parental claim. Moreover, the court ruled that Dillard was never given a fair opportunity to demonstrate his parenting ability because Kelly had resided exclusively with the Conners throughout the litigation. That ruling, issued on March 1, 1988, was affirmed by the Pennsylvania Superior Court on December 5, 1988. *See In Re Adoption of Stunkard,* 380 Pa.Super. 107, 551 A.2d 253 (1988). Golden Cradle sought review by the Pennsylvania Supreme Court but that court denied allocatur on June 12, 1989.

Following affirmance of the denial of Golden Cradle's petition to terminate Dillard's parental rights, the parties returned to the Montgomery County Orphans' Court which then transferred Dillard's custody petition, which had been held in abeyance pending the termination appeal, to the Family Court Division of the Court of Common Pleas. In November, 1989, the Conners, joined by Reed and Golden Cradle, filed a motion to transfer jurisdiction of the custody proceeding to Delaware pursuant to the Uniform Child Custody Jurisdiction Act (UCCJA), 42 Pa.C.S.A. § 5341 *et seq.* After briefing and argument on that motion, the Family Court Division agreed that Delaware was the most appropriate forum for disposition of the custody dispute since all parties, including the child, were Delaware residents. The court's order declining jurisdiction, however, spawned a new series of appeals at Dillard's

initiative. In October, 1990, the Pennsylvania Superior Court affirmed the lower court's decision and on July 31, 1991, the Pennsylvania Supreme Court denied review, although its order of remand to the Family Court Division was not issued until September 25, 1991. By that time, Kelly, still residing with the Conners, was approaching five years of age and the parties had been engaged in almost continuous litigation over her adoption and/or custody.

■ Upon the conclusion of the Pennsylvania litigation, Dillard was contacted by a representative of DDCPS to discuss further proceedings in the Family Court. On October 24, 1991, Dillard met with an attorney for DDCPS who advised him to secure Delaware counsel and that, under Delaware law, he had to initiate some contact with Kelly within six months to avoid termination of his parental rights. There was no discussion at that time of when the six months began to run. Dillard advised the DDCPS representative of the Pennsylvania litigation but they were unable to locate the records which were to be transferred to the Delaware Family Court.[3]

Dillard did not attempt to make contact with Kelly beyond sending her a Christmas card on December 20, 1991 and a New Year's card on December 31, 1991. Both cards contained the message "Your father, Thomas Dillard." The Conners did not show either card to Kelly. Dillard filed a petition for visitation in the Delaware Family Court on February 26, 1992. Earlier, on February 5, 1992, Reed had filed a petition in the Family Court to terminate Dillard's parental rights alleging that six months had elapsed since the Pennsylvania court's July 31, 1991 transfer ruling without Dillard "plan[ning] adequately for the child's physical needs or her mental and emotional health and development." Reed's petition recited that the Conners were filing a concomitant petition for adoption to which she consented. The Conners also sought to intervene in the termination proceedings.

---

3. Dillard searched for the records on his own. He discovered that the records had indeed been sent from the Montgomery County Court but had been incorrectly delivered to the New Castle County Court of Common Pleas where they re- mained until found on March 3, 1993, over a year after Dillard initiated his Family Court petition. In Delaware, the Court of Common Pleas has no subject matter jurisdiction over domestic relations matters.

The Family Court proceedings extended for several months with the parties engaged in discovery and Dillard unsuccessfully seeking a writ of habeas corpus to require the return of Kelly to him forthwith. An amended petition for termination was filed by Reed on December 18, 1992, alleging abandonment and the Family Court conducted an evidentiary hearing on the merits of that petition. The Family Court denied the Conners' motion to intervene and also rejected Reed's efforts to have a guardian *ad litem* appointed to represent Kelly's interests in the termination proceedings.

On April 26, 1993, the Family Court issued an opinion and order which: (1) concluded that the rulings of the Pennsylvania Court of Common Pleas, as affirmed, foreclosed the question of whether there was a basis for termination of Dillard's parental rights prior to the transfer of custody jurisdiction to Delaware and (2) ruled that the six month period of abandonment under Delaware law began on October 24, 1991, when Dillard was advised to assert his parental rights and was effectively tolled by his February 26, 1992 custody/visitation petition. The court further noted that under a subjective test of intent to abandon, Dillard's seven year effort to litigate his parental rights in Pennsylvania and Delaware was clear evidence that he did not wish to relinquish such rights. Finally, the Family Court noted that Dillard's visitation rights could only be implemented after extensive planning and, to assist in the transition process, a guardian *ad litem* should be appointed to represent Kelly's interests.

Reed has appealed from the denial of her petition to terminate Dillard's parental rights as well as from the Family Court's interim ruling which denied her motion to require Dillard to submit to a psychological examination for use in the termination proceedings. Dillard has cross-appealed from the denial of his petition for a writ of habeas corpus. In view of the importance of the issues presented in this appeal, and because Dillard had appeared *pro se* in the Family Court and on appeal, this Court appointed Kevin Gross, Esquire, as counsel for Dillard to brief the issues on appeal. The Court has also appointed P. Clarkson Collins, Jr., Esquire, and Barbara D. Crowell, Esquire, as guardians *ad litem* for purposes of this appeal to brief and argue in the interest of the child. We are grateful to all appointed counsel for their assistance, which was rendered *pro bono publico,* in the best tradition of the Delaware Bar.

## II

In a termination of parental rights proceeding in the Family Court, the standard of proof is one of clear and convincing evidence, whether the petition be initiated by the State or a private litigant. *Patricia A.F. v. James R.F.*, Del.Supr., 451 A.2d 830 (1982). On appeal from the grant or denial of a termination petition, this Court will conduct a limited review of the factual findings of the trial court to assure that they are sufficiently supported by the record and result from an orderly and logical deductive process. In the absence of such assurance, or if the findings are clearly wrong, this Court is free to make independent findings. *Levitt v. Bouvier*, Del.Supr., 287 A.2d 671, 673 (1972). When the issues on appeal implicate rulings of law, our review is *de novo* and this Court will set aside erroneous interpretations of applicable law. *Black v. Gray*, Del.Supr., 540 A.2d 431, 432 (1988).

## III

### A.

Preliminary to addressing the merits of the Family Court's determination of non-abandonment by Dillard, we deem it important to consider the preclusive effect of the Pennsylvania litigation on the Family Court. As previously noted, the Pennsylvania litigation involved two distinct proceedings: (1) the termination of parental rights action initiated by Golden Cradle with the support of Reed and the Conners and (2) the custody and/or visitation petition filed by Dillard on March 3, 1987, five weeks before Golden Cradle's petition. The petitions were bifurcated by the Pennsylvania Court of Common Pleas and the custody petition stayed pending the outcome of the termination proceedings. The trial and subsequent appeals in the termination matter consumed more than

two years and it was not until October 26, 1989, that the Family Court Division of the Court of Common Pleas of Montgomery County ordered a full custody hearing in response to Dillard's 1987 custody petition.

The judgment of the Pennsylvania Court of Common Pleas in the termination phase, once finalized on appeal, bars any relitigation of those claims under the Full Faith and Credit Clause of the U.S. Constitution. Moreover, the findings of the Pennsylvania courts in the termination proceedings are entitled to collateral estoppel treatment because of the privity between Reed and Golden Cradle in the Pennsylvania effort to terminate Dillard's parental rights. *Columbia Casualty Company v. Playtex FP, Inc.*, Del.Supr., 584 A.2d 1214, 1217 (1991).

As to the custody phase of the Pennsylvania litigation, however, no such preclusive effort is required since the Pennsylvania Court of Common Pleas never considered the merits of Dillard's custody petition, opting instead, in its order of December 1, 1989, to decline jurisdiction on grounds of "inconvenient forum" under 42 Pa.C.S.A. § 5348.[4] Dillard, of course, appealed this order, in lieu of seeking immediate relief in the Family Court of Delaware, which resulted in an additional eighteen months of delay. Further inquiry into Dillard's conduct and motivation, in continuing to litigate the ruling of the Pennsyl-

vania court declining jurisdiction, is open to examination in connection with the remand hereafter ordered.

### B.

Parental rights arise from a natural relationship and are fundamental liberties which the law has traditionally recognized. Those rights may not be abrogated in the absence of the most compelling reasons. *In Re Burns*, Del.Supr., 519 A.2d 638, 645 (1986); *Daber v. Division of Child Protective Services*, Del.Supr., 470 A.2d 723, 726 (1983). In Delaware, the statutory standard is twofold: proof of an enumerated statutory ground and a determination that severing the parental tie would be in the best interest of the child. 13 *Del.C.* § 1103(a)(2). This Court has consistently ruled that the statutory scheme recognizes "the parent's strong interest in his or her child" which will be terminated only upon "a showing, by clear and convincing evidence, that the parent is unable to meet the statute's guidelines." *In Re Hanks*, Del.Supr., 553 A.2d 1171, 1178 (1989). *See also Black v. Gray*, 540 A.2d at 433; *Daber v. Division of Child Protective Services*, 470 A.2d at 726.

In her amended petition in the Family Court, Reed relied upon a claim of abandonment to satisfy the first prong of § 1103.[5]

4. We have some difficulty understanding the ruling of the Pennsylvania Court of Common Pleas declining jurisdiction under the Uniform Child Custody Jurisdiction Act (UCCJA) 42 *Pa.C.S.A.* § 5341 et seq. The UCCJA requires a court declining jurisdiction on the ground that another state is a more appropriate forum to either "dismiss the proceedings," or "stay the proceedings upon condition that a custody proceeding be promptly commenced in another named state or upon any other condition which may be just and proper." 42 *Pa.C.S.A.* § 5348(e). Upon either dismissal or stay, the transferring court is required to "inform the court found to be the more appropriate forum of this fact." § 5348(h). Delaware has adopted the UCCJA, 13 *Del.C.* §§ 1901 to 1925, and thus parallel provisions are applicable under Delaware law.

The Pennsylvania court, in apparent noncompliance with the UCCJA, did not dismiss or stay Dillard's custody petition but by order dated December 1, 1989, "decline[d] jurisdiction ... and refer[red] the matter to the Family Court of New Castle County, State of Delaware for proper dis-

position." Had Dillard been required to "promptly commence" a custody proceeding in Delaware as required by the UCCJA, much of the controversy over the lost files might have been avoided and responsibility placed squarely upon him to assert his parental rights.

5. We are troubled by the allegations in the original petition for termination filed by Reed in the Family Court on February 5, 1992 and repeated in the amended petition, filed on December 18, 1992. Both petitions recite that "[t]he original termination of parental rights was brought in Pennsylvania and then jurisdiction was transferred to Delaware by Order of the Pennsylvania Court on July 31, 1991." This statement is clearly incorrect and misleading. The Pennsylvania phase of the termination proceeding had been concluded when the Pennsylvania Supreme Court denied further review of the termination denial on June 12, 1989. The July 31 date reflects the action of the Pennsylvania Supreme Court in denying review of the father's *custody* petition even though the actual remand did not occur until September 25, 1991. Contrary to the

"Abandonment" in the parental termination context is defined as:

> referring to any child who, for a period of six months ... has not received any regular and reasonable financial help from his parent or parents ... and on whose behalf no substantial contacts have been initiated by his parent or parents during that period. 13 *Del.C.* § 1101(1).

In addition to the statutory factor of abandonment, the parent must evidence the "settled purpose" of abandonment with a present and continuing intent to surrender all further parental claims to the child. *Black v. Gray*, 540 A.2d at 433 (citing *Cline v. Hartzler*, Del.Supr., 227 A.2d 210, 212 (1967)).

Reed contends that the Family Court erred not only in its application of the statutory standard but also in calculating the date from which the six month period began. The Family Court held that the six month period did not begin until October 24, 1991, the date when Dillard received notice from DDCPS that he must initiate contact with Kelly. Reed urges acceptance of a starting date of July 31, 1991, the date when the Pennsylvania Supreme Court denied review of Dillard's appeal, thus effectively ending the Pennsylvania litigation. We agree that the Family Court erred in adopting the October 24, 1991 date since Dillard was clearly on notice in advance of this date that the custody/visitation matter was no longer before the Pennsylvania courts.

The correct date for the commencement of the six month period is September 25, 1991, the date the Prothonotary of the Pennsylvania Supreme Court officially remanded the record to the trial court. Rule 2591 of the Pennsylvania Rules of Appellate Procedure provides that not until remand of the record to the trial court can there be further proceedings in accordance with the Supreme Court's ruling. While this date has objective significance for purposes of determining when jurisdiction was formally divested by the Pennsylvania court, it does not necessarily control the question of Dillard's subjective intent to assert his parental rights through the initiation of "substantial contacts." 13 *Del.C.* § 1101(1).

Before considering the Family Court's determination that there was not clear and convincing evidence to demonstrate Dillard's subjective intent to abandon his child, we address the contention advanced by Reed and the guardians *ad litem* that the best interest of the child may provide the basis for termination of parental rights even if one of the stated grounds for termination does not exist.

Reed and the guardians *ad litem* acknowledge the literal force of 13 *Del.C.* § 1103 but call for an interpretation of parental termination procedure which focuses exclusively on the "best interest of the child" as that phrase appears in 13 *Del.C.* §§ 1108(a).[6] Such a result, it is argued, is mandated by the requirement of 13 *Del.C.* § 1115 that "all questions of interpretation shall be resolved" with "the paramount objective" of advancing the best interest of the child.

In effect, Reed and the guardians *ad litem* argue that this Court should sanction the termination of Dillard's parental rights regardless of whether his abandonment of Kelly has been established. Acceptance of a best interest of the child standard as the exclusive basis for termination of parental rights, however, would be at clear variance with a succession of decisions of this Court which, implicitly at least, permit consideration of the best interest element only after there has been a finding of one of the factors set forth in 13 *Del.C.* § 1103. *In Re Hanks*, 553 A.2d at 1179, *Black v. Gray*, 540 A.2d at 434, *Daber v. Division of Child Protective Services*, 470 A.2d at 728, and *Cline v. Hartzler*, 227 A.2d at 212.

allegation of the petition and the amended petition, no Pennsylvania court ever transferred jurisdiction over the termination petition.

**6.** 13 *Del.C.* § 1108(a) provides:

(a) Should the Court find the termination of existing parental rights and their transfer to be in the best interest of the child, it shall make an order terminating such rights in the parent or parents, person or persons or organization in which they have existed and transferring them to some other person or persons or the Department or a licensed agency as may, in the opinion of the Court be best qualified to receive them.

Apart from the break with precedent, moreover, acceptance of a best interest of the child as the exclusive or dominant ground for termination of parental rights raises a serious due process and equal protection concern. It is now firmly established that the parental rights of biological parents, including unwed fathers, may not be abrogated through State action without a full opportunity to be heard on the question of parental fitness. *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). The U.S. Supreme Court has more recently indicated that a biological connection alone, unaccompanied by an actual social relationship, may not provide the basis for a protected constitutional interest. *Lehr v. Robertson,* 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983). But where, as here, a parent has sought to assert and maintain a parental relationship over an extended period of time, adherence to established statutory standards for determining unfitness is a *sine qua non* in any effort to extinguish parental rights.

Application of a best interest of the child standard without a determination of unfitness carries the dangerous potential of placing the welfare of the child over the legitimate familial interests of parents who have sought to assert their parental rights in good faith. Our society daily witnesses children in deprived situations, attributable to the economic or cultural disadvantages of their custodial parents, who would clearly benefit from placement with, and adoption by, individuals who would give them a higher level of material and emotional support. A transfer of parental rights in such settings may well advance the best interest of a particular child but the law does not sanction such a change without compliance with statutory standards. *See In the Interest of B.G.C.,* Iowa Supr., 496 N.W.2d 239, 245 (1992) ("statutory grounds for termination must be established in addition to establishing the child's best interests in order to terminate"); *Matter of Baby M,* Supr., 109 N.J. 396, 537 A.2d 1227, 1252 (1988) ("It has long been decided that the mere fact that a child would be better off with one set of parents than with another is an insufficient basis for terminating the natural parent's rights.").

In a related argument to their best interest of the child contention, the guardians *ad litem* argue that the Family Court violated Kelly's constitutional rights in failing to terminate Dillard's parental rights by depriving her of the stability and continuity of the ongoing relationship with her prospective adopting parents. While this is an emotionally appealing argument, it fails for much the same reason as the best interest argument. While it is true that Kelly has certain fundamentally-vested interests, also deserving of constitutional protection, those interests are circumscribed by the competing constitutional rights of her biological parents. While the State may intervene in that relationship, it may do so only on clear and convincing evidence that the parent has forfeited the parental entitlement.

In *Michael H. v. Gerald D.,* 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91, *reh'g denied* 492 U.S. 937, 110 S.Ct. 22, 106 L.Ed.2d 634 (1989), *leave to file a second petition for reh'g denied,* 499 U.S. 984, 111 S.Ct. 1645, 113 L.Ed.2d 739 (1991), the Supreme Court declined to rule on a child's constitutional right to determine her family relationship. The Supreme Court stated:

> We have never had occasion to decide whether a child has a liberty interest, symmetrical with that of her parent, in maintaining her filial relationship. We need not do so here because, even assuming that such a right exists, [the child's] claim must fail.

491 U.S. at 130, 109 S.Ct. at 2346. The court went on to hold that California's decision to treat the child differently than her parents was not a denial of equal protection because the state was pursuing a legitimate end by rational means.

Such is the case here. Through the enactment of statutory standards which govern the termination of parental rights, the State of Delaware is pursuing the legitimate goal of assuring that children retain the natural parental relationship, unless it is shown by clear and convincing evidence that the statutory test has been satisfied and it is in the best interests of the child to sever that bond. Although the end result might ultimately be unfair to Kelly to the extent that it might

jeopardize her current advantageous relationship with the Conners, a reasoned application of the statutory standards for termination will not abridge her constitutional rights.

In determining whether the statutory test of abandonment has been satisfied, the Family Court must often weigh the objective conduct of the parent whose rights are sought to be terminated against subjective intent. Thus, even if there is evidence of the passage of the six month period without "financial help" or "substantial contacts" within the meaning of 13 *Del.C.* § 1101(1), a parent's subjective intent which belies a settled purpose to abandon may be controlling. *Black v. Gray*, 540 A.2d 431. Similarly, where there is evidence of financial help or substantial contact[7] within the six month period, intent remains a necessary finding and, in determining such intent, the court must view evidence of subjective intent as well as conduct. *Id.* at 433. A parent may have a settled purpose to abandon based on subjective intent despite a technical avoidance of the six month period where it has been shown that the parent's efforts at maintaining parental ties were either not substantial or not extended in good faith and with consideration of the child's need for ongoing parental support. In short, responsible parenting may require more than the technical avoidance of statutory grounds, if other evidence shows clearly and convincingly that the parent had a settled purpose to abandon.

Frequently, the natural parent offers testimony as to his or her subjective intent in an effort to defeat a petition, such as this one, based on a claim of abandonment. However, our courts consistently have recognized that such testimony is *not* dispositive. In *In re Kline*, Del.Orph., 8 A.2d 505 (1939), a teen-aged unwed mother left her infant with her stepbrother shortly after birth. The child was five years old by the time of the decision and, during the intervening years, the mother had visited the child less than twice a year and furnished a small amount of clothing for the child. The mother opposed a petition for adoption filed by the stepbrother and his wife, testifying that she wanted the child. The court held that the mother's conduct demonstrated a settled purpose to forego parental duties, notwithstanding the mother's testimony. The court noted that an intention to abandon can be revoked, but stated that, "mere expressions of desire or regret, unaccompanied by affirmative acts and conduct, are not sufficient to accomplish such a revocation." *Id.* at 508. In *G. v. S.*, Del.Supr., 238 A.2d 834 (1968), this Court observed that the intent to forego parental duties is usually shown by conduct. In that case, the father had petitioned the Family Court seven times to enforce his visitation rights, and he testified that he never intended to abandon his children. He only stopped visiting them because of the mother's refusal to allow visits. Nonetheless, the trial court found an intent to abandon and we affirmed that decision. *Id.* at 836. *See also In re E.*, Del.Supr., 239 A.2d 626, 627 (1968) (upholding the trial court's finding of an intent to forego parental duties and noting that the trial court "obviously rejected the testimony of [the mother] to the contrary"); *Division of Social Services v. Tusiki*, Del.Fam., 446 A.2d 1109 (1982) (finding an intent to abandon after evaluating the father's testimony that he has never abandoned his child and he always wanted her against the objective evidence of lack of involvement).

In sum, the statutory showing of abandonment is not defeated by a parent's mere denial of a "settled purpose" to forego parental rights. To the contrary, the objective evidence of failure to provide financial support or initiate substantial contacts for six months generally will also establish a settled purpose to abandon.

---

7. The initiation of legal proceedings has been construed as constituting a *prima facie* showing of substantial contact, *e.g.*, a good faith petition for visitation. This *prima facie* construction of substantial contact encourages participation in the judicial process, rather than self-help, by providing for a technical avoidance of the statutory definition for abandonment. If it is subsequently determined, however, that the legal proceedings were either not initiated in good faith or not pursued in good faith, the *prima facie* basis for finding a technical avoidance of the statute would be rebutted, and the statutory definition of abandonment would be satisfied.

## C.

In its determination that Dillard had not "abandoned" Kelly, the Family Court focused upon the events which occurred in the period of approximately six months following the conclusion of the Pennsylvania litigation. In its analysis of the evidence concerning whether Dillard, from a subjective viewpoint, "had a settled purpose to abandon his child," the court engaged in an "overall review" of Dillard's action in the five years of litigation in Pennsylvania. Crediting the father's "persistent efforts" at great expense, the Family Court concluded that his actions were "totally contrary to any settled purpose on his part to abandon this child and surrender all parental claims to her." We have carefully reviewed the father's litigation efforts in the light of events which occurred following the Family Court's decision and we entertain serious doubt concerning the good faith of the father's efforts. In any event, we find the present record, at best, incomplete and deserving of elaboration upon remand.

Dillard's principal defense to the claim of abandonment is that, with great persistence and at significant financial cost, he sought to preserve his parental rights. As noted, the Family Court agreed with this contention in finding no settled purpose to abandon. But implicit in such a determination must be a finding that there has been a good faith initiation and prosecution of litigation not only in resisting previous termination efforts but in pursuing custody or visitation rights which would constitute "substantial contacts" within the meaning of the statute. Two aspects of Dillard's litigation efforts cause us concern.

The Family Court credits Dillard's persistence in continuing the custody aspect of the Pennsylvania litigation as evidence of his desire to establish contact with Kelly. The record, however, suggests the contrary. When the Pennsylvania Court of Common Pleas declined jurisdiction of Dillard's custody petition on December 1, 1989 in favor of Delaware, Dillard was afforded the opportunity to secure his custody rights promptly in a convenient forum—the home state of all parties to the custody dispute. Instead, Dillard chose to appeal the ruling and to delay, for 18 months, a hearing on his own custody petition. Such conduct on Dillard's part may justify the conclusion that he was more interested in litigating than parenting.

More importantly, it now appears that Dillard failed to appear at a hearing on his visitation petition, which the Family Court scheduled following the denial of the termination petition which forms the basis for this appeal. In this Court's panel opinion of October, 1994, it was assumed that the companion visitation proceeding was viable. Indeed, the panel opinion urged an expeditious processing of that matter. The Court has since learned, through judicial notice of the records of the Family Court, D.R.E. 202(d), that the visitation petition was dismissed on October 18, 1993 because Dillard failed to appear for the scheduled hearing. Dillard did not appeal that ruling. Dillard's failure to pursue his visitation petition is significant because the Family Court considered his February 26, 1992 petition for visitation as "tolling" the six month statutory period of abandonment. In light of our conclusion that the dismissed visitation petition, as a matter of law, might not be deemed the initiation of a "substantial contact," the Family Court must now determine whether any conduct by Dillard, other than litigation, within six months after September 25, 1991, constitutes the initiation of substantial contact. In testing Dillard's good faith and subjective intent, the court may consider his conduct in the Pennsylvania aspect of the custody/visitation dispute.

In order to provide proper notice of the claim of abandonment based on Dillard's conduct during the period following the filing of his February 26, 1992 visitation petition, and to meet the procedural requirements of 13 *Del.C.* § 1105, on remand the original petitioner, Reed, should be afforded the opportunity to amend her petition for termination to include the expanded time period, and the trial court should conduct a hearing on the amended petition. In view of the questions raised by this record concerning Dillard's litigation efforts in delaying the transfer of his own Pennsylvania custody motion and his failure to participate in the visitation hearing afforded by the Family Court, a psychologi-

cal evaluation of Dillard may be appropriate. We leave that determination to the Family Court.

In the event that the Family Court, upon remand, concludes that abandonment within the meaning of 13 *Del.C.* § 1101(1) has been established by clear and convincing evidence,[8] we assume it will proceed to determine the best interest of the child component of the termination standard.

### IV

We next address the appeal of the Conners from the Family Court ruling which denied them the status of intervenors in the termination proceeding initiated by Reed. They argue that they were entitled to intervene both to protect their constitutional rights as prospective adoptive parents and to protect Kelly's due process right to pursue a more significant family relationship.

In rejecting the Conners' motion to intervene the Family Court relied upon 13 *Del.C.* § 1104 and Family Court Civil Rule 24(a). Section 1104 is entitled "Persons Eligible to Petition for Termination of Parental Rights" and enumerates those persons who "may" file a petition as any of the following: "(1) The mother of a child; (2) The father or presumed father of a child; (3) Both parents of a child; (4) A blood relative of a child; (5) The Department or a licensed agency." The Family Court noted that section 1104 does not include prospective adoptive parents within its listing and Family Court Civil Rule 24(a) permits intervention only "when a statute confers an unconditional right to intervene" or if the appellant's interest is not represented adequately by the existing parties. The court was of the view that Reed, represented by counsel, was quite capable of pursuing the termination petition.

The Conners argue that Family Court Civil Rule 24(b), which provides for permissive intervention, controls and that the Family Court erred in considering Rule 24(a). Rule 24(b) provides that a party may be permitted to intervene if "a statute confers a conditional right to intervene; or when an applicant's claim or defense and the main action have a question of law or fact in common." The rule further provides that the court, in the exercise of discretion, shall consider whether the intervention will delay or prejudice the adjudication of the rights of the original parties.

The entitlement, in the first instance, to petition for termination of another's parental rights has been statutorily fixed with "great legislative deliberation" and the courts have no power to add or detract from the jurisdictional parameters of the statute. *In Re Dingee*, Del.Supr., 316 A.2d 555, 556 (1974). Although the court's power to grant intervention once a proper petition has been filed rests on separate discretionary authority, the court should not permit by intervention what has been directly forbidden.

Section 1104 does not provide a conditional right to intervene as that concept is embodied in Rule 24(b). Since the primary material issue before the Family Court was the determination of whether Dillard had "abandoned" Kelly within the meaning of 13 *Del.C.* § 1103, the Conners have no right to assert such a claim in common with Reed. Further, whatever interests the Conners assert jointly with Reed in seeking to terminate Dillard's parental rights in order to pursue their adoptive goals, those interests were adequately advanced by Reed who shared that goal as well. Kelly's interests were fully and adequately represented by Reed in the Family Court and, on appeal, by the guardians *ad litem.* While the Conners have a strong personal interest in the outcome of this litigation, they are not proper parties with entitlement to intervene. We find no abuse of discretion in the Family Court's ruling which denied intervention.

### V

Dillard has cross-appealed from the Family Court's denial of his petition for a Writ of Habeas Corpus. This issue is quick-

---

**8.** The clear and convincing evidence standard, while more demanding than preponderance of the evidence, does not require the court to accept the testimony of all witnesses regardless of the court's assessment of the witnesses' credibility. *See, e.g. Matter of Buckson,* Del.Jud., 610 A.2d 203, 217 (1992).

ly addressed. In Delaware, a writ of habeas corpus is an extraordinary remedy issuable by a trial court to inquire into the legality of persons detained or under restraint of their liberty. *Family Court v. Alexander*, Del. Supr., 522 A.2d 1265 (1987). The fundamental purpose of the writ is to benefit prisoners. The Delaware habeas corpus statute, 10 *Del.C.* § 6901 *et seq.*, is designed to accomplish a speedy inquiry into an allegedly unlawful detention through a summary judicial proceeding. *Petition of Pitt*, Del.Supr., 541 A.2d 554 (1988). Habeas corpus clearly is not a substitute for an examination into the propriety of a longstanding child custody arrangement under the supervision of an appropriate State agency. In the absence of an emergency where a child is at risk of physical and emotional harm, a writ of habeas ·corpus should not be used as the procedural vehicle to determine custody. The Family Court correctly rejected Dillard's petition for such a writ.

### VI

Our partial affirmance and remand, unfortunately, does not end this long and traumatic litigation over the parental rights of a young child. In that regard, certain comments of the panel opinion bear repeating. Children should not be placed in a legal limbo for long periods of time while adults litigate their claims of relationship. All the adult parties to this proceeding bear some blame for their acrimonious and often misleading efforts to delay and frustrate the legal process.

As the panel opinion also noted, the legal system itself is not without criticism for the delay which has exacerbated the uncertainty of this child's future. To ensure that further delays are held to a minimum we retain jurisdiction over this appeal and direct the Family Court to schedule further proceedings on a priority basis. We expect a prompt filing of an amended petition, early completion of any further discovery and/or testing, and a full hearing within ninety days of the date of this opinion. The Family Court is expected to render a prompt determination, thereafter, consistent with its other obligations. Dillard must have the benefit of counsel in further termination proceedings and, if he is unable to afford counsel, the Family Court should appoint counsel for him.[9]

The judgment of the Family Court is AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings on a priority basis. Jurisdiction is RETAINED.

---

9. Although this Court appointed counsel to represent Dillard in this appeal, he has filed *pro se* motions which have no legal merit. If Dillard persists in such efforts, and in permitting non-

lawyers to provide him with legal advice, he must bear full responsibility for the consequences of such conduct.